953 F.Supp. 1085 (1997)
Michael J. HALEY, Plaintiff,
v.
Jonathan L. FIECHTER, Acting Director of the Office of Thrift Supervision, Defendant.
No. 4:93CV2625SNL.
United States District Court, E.D. Missouri, Eastern Division.
February 5, 1997.
*1086 *1087 Samuel H. Liberman, Liberman and Goldstein, St. Louis, MO, for plaintiff.
Teresa A. Scott, Aaron B. Kahn, Office of Thrift Supervision, Washington, DC, for defendant.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
Plaintiff has brought this action, pursuant to the whistleblower provision of the Federal Deposit Insurance Act, 12 U.S.C. § 1831j[1], alleging that he was wrongfully terminated from his employment as a bank examiner because he provided information to the Federal Deposit Insurance Corporation (FDIC) about possible violations of laws and regulations by the Office of Thrift Supervision (OTS). The case was tried before the Court sitting without a jury on January 24 and 25, 1996. At the conclusion of trial both parties made oral motions for judgment as a matter of law. These motions were taken with the case.
After careful consideration of all objections to exhibits taken with the case, all said objections are hereby overruled, and all exhibits offered into evidence at trial are received into evidence. Defendant's oral objections to the plaintiff's introduction into evidence of defendant's answers to plaintiff's request for admissions are overruled. This Court, having now considered the pleadings, the testimony of witnesses, documents in evidence, and the joint stipulation of facts filed by the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

FINDINGS OF FACT
Plaintiff Michael Haley began his employment with the OTS in 1977.[2] From 1977 until his discharge in 1990 plaintiff worked as bank examiner for the OTS. As a bank examiner, plaintiff conducted 12-20 bank exams per year. Bank examiners were assigned different banks each year to make onsite visits in order to review their books and records for compliance with federal laws and regulations; and to generally observe the safety and soundness of the bank's operations. Examiners gathered factual information from which the OTS' supervisory personnel would make decisions as to corrective actions, mergers, acquisitions, etc. Although bank examiners might assist in making corrective action decisions, they were not the ultimate decision-makers. Finally, although a bank examiner might examine the same bank several times over a number of years, individual banks were not assigned to specific examiners for each and every exam.
In 1981 plaintiff was assigned for the first time to examine the Marion County Mutual Loan & Bldg. Association (MCM), a savings and loan association regulated by the OTS. *1088 The managing officer, during the relevant time-period, was Bayard Plowman. In the early 1980s, many small banking institutions were suffering large capital losses due to high interest rates on deposits but low interest rates on long-term mortgages. MCM had lost money for the first time in its history and was projecting continuing large losses in the upcoming year. The next several years were difficult for MCM; however, beginning in 1986 MCM's financial situation showed signs of improvement.
Plaintiff returned for quarterly visits to MCM in 1985, 1986, and 1987. Another bank examiner, Carman Gassert, also regularly examined MCM in 1982, 1983, 1985, and June of 1990. One of the reasons that MCM showed steady financial improvement was its participation in the net worth certificate program provided by the Federal Savings and Loan Insurance Corporation (FSLIC).[3] Under this program, MCM provided a note to the FSLIC which in turn provided certificates to MCM. Until 1989, MCM could then count the certificates as regulatory capital.[4] After 1989, although there was no supporting statutory authority, the OTS stopped viewing the certificates as capital. It did not count these certificates as capital when examining financial institutions under "generally accepted accounting principles (GAAP)". This was the OTS' policy until May 1991. See, Plaintiff's Exhibits 61 and 62.
Haley was very impressed with the recovery that MCM was making and believed that its management was responsible for MCM's improved financial health. In 1987, Haley began to discuss his favorable impressions of MCM with his supervisor, Lyle Townsend. Mr. Townsend, however, did not share these positive viewpoints and believed that MCM's management was not nearly as competent as Haley thought.
In April of 1989 Robert Maffitt became Haley's supervisor. In addition to being plaintiff's supervisor, Mr. Maffitt was responsible for supervising the day to day regulation of MCM. He dealt with MCM's management and board of directors on a regular basis. At the time Maffitt took over regulatory responsibilities for MCM, it had been steadily making positive progress towards financial stability. However, Maffitt believed that MCM's management was only doing a "fair" job in restoring MCM to a viable stable financial institution.
Another change took place in 1989 affecting the supervisory regulation of MCM. Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) which altered the capital requirements for thrift institutions. Three major changes were: 1) increased capital maintenance requirements; 2) financial institutions were required to meet at least three (3) different capital requirement standards; and 3) new deadlines by which to meet these new requirements. As a direct result of these FIRREA requirements, MCM had to submit to OTS, for its approval, a capital plan.
In the spring of 1989, OTS contacted MCM and expressed certain concerns regarding its plans for capital enhancement. Plaintiff conducted an examination of OTS in July 1989. He believed that MCM was well on the road to profitable financial status. He discussed with Plowman the financial health of MCM. Plowman knew that MCM's capital deficiencies were still a concern to OTS. He also expressed concern with Roosevelt Federal Savings and Loans' low loan rate in the community and its negative impact on MCM's financial health.
Meanwhile, Maffitt wanted MCM to provide more specific information as to its plans for addressing the OTS' perceived capital deficiencies. He also requested MCM's board of directors to sign a consent agreement allowing the OTS to find an interested acquirer or merger partner for MCM. During this time, it was known in the small banking community of the Hannibal area, that certain financial institutions were interested in the acquisition of or merger with *1089 MCM.[5] MCM rejected the idea of acquisition or merger, and refused to sign the consent agreement. It informed the OTS that it intended to raise the required capital by engaging in a stock conversion. It also raised the issue of the use of its $1,050,000.00 in net worth certificates as GAAP capital.
In September 1989, plaintiff attempted to discuss his July 1989 exam of MCM with Maffitt. Maffitt was generally not positive about MCM's future. He was critical of plaintiff's July 1989 exam of MCM.
In January 1990 MCM submitted its capital plan to the OTS. The capital plan was founded on a stock conversion and conversion of the net worth certificates into an instrument qualifying for tangible or core capital. The OTS had numerous concerns about the plan especially with regard to a sizeable risk to the insurance fund for the purported stock conversion, and the lack of information regarding who would buy the stock and when. Furthermore, the OTS simply did not believe that the net worth certificates could be converted into any instrument capable of being accepted as core capital. Meanwhile, plaintiff researched the issue of the conversion of the net worth certificates and discovered that such a conversion was possible. He spoke to Tim O'Leary, his direct supervisor, about what he had found but his comments were rebuked.
In April 1990 MCM's capital plan was rejected by the OTS. Although Maffitt was not in favor of the stock conversion as a solution to the capital deficiencies, he did allow MCM to briefly explore the possibility of pursuing the stock conversion. Meanwhile, he actively pursued two other avenues for resolving the situation. He sought a merger partner or an institution to acquire MCM and he sought a consent agreement from MCM. The consent agreement would give the OTS virtual control over the management of MCM and the power to authorize the acquisition or merger of MCM. MCM continued to reject entering into the consent agreement.
In June 1989 Ms. Gassert completed an exam of MCM. She found the institution making significant strides in overcoming its financial deficiencies. She discussed her findings with Maffitt and told him that she thought the stock conversion would be a feasible strategy for raising capital and that the insurance risk was minimal. Maffitt did not agree with her findings or opinion. Maffitt was set on finding a buyer or merger partner for MCM.
Although plaintiff was not assigned to MCM and no longer had any responsibility for it, he was bothered by what he perceived to be a campaign waged by the OTS to get rid of MCM's management and either sell or merge MCM. He searched OTS' files and found documents rejecting MCM's capital plan and outlining OTS' intentions to force MCM to sign the consent agreement and to find a buyer or merger partner for MCM. Plaintiff believed that the OTS' plans were not only unnecessary but in violation of banking laws and regulations. He felt that the OTS was in error, perhaps even committing a violation of federal banking law and regulations, by not recognizing the net worth certificates as capital. He further believed that MCM was entitled to an exemption from sanctions, including a new capital plan. He further believed that Maffitt's threat to put MCM into receivership if its board of directors did not sign the consent agreement was illegal. Finally, he believed that Roosevelt's acquisition of or merger with MCM was a violation of the OTS' duties, given Roosevelt's poor lending record in the community.
Plaintiff called Ms. Gassert to discuss what he had found in the OTS' files. She agreed that Maffitt was doing everything he could to sell or merge MCM. Plaintiff then contacted Mr. Plowman at MCM. Plaintiff believed that Maffitt was improperly pressuring MCM into an involuntary merger with Roosevelt. Plowman was upset about his dealings with the OTS. He agreed that although MCM was consistently showing earnings, OTS was still going to take MCM away *1090 from him. Plowman told Haley that he intended to discuss MCM's situation with his congressman and with the FDIC in hopes of preventing the forced merger. Haley volunteered to write a letter on behalf of MCM to certain members of Congress. Plowman told Haley not to do it because he feared that Haley would lose his job. Haley thought about what he wanted to do and decided to write a memorandum setting out his knowledge of the situation and his opinion as to why the forced merger or sale was unnecessary. He contacted Plowman again to obtain some additional information. Plaintiff told Plowman that he was writing this memorandum and that upon receipt of it, Plowman was to use the memorandum in any way which would help MCM.
Plaintiff began to draft his memorandum. He wanted the memorandum to be a written protest of the forced merger and to be used to stop the proposed merger.[6] Before completing his memorandum, he again contacted Ms. Gassert. She agreed with the substance of his memorandum and told him she had discussed MCM with Maffitt but that he was adamant about selling or merging MCM. On July 2, 1990 he faxed a copy of his memorandum to Gassert. She checked it for accuracy. She further told plaintiff that he should follow OTS procedures and express his disagreement over MCM through the OTS chain of command.
On or about July 3, 1990 Haley completed his memorandum and sent a copy of it to his superiors at the OTS and to Skip Sage, a state regulator of Marion County.[7] Also, unbeknownst to his superiors at the time, plaintiff also sent a copy of the memorandum to Mr. Plowman with a note instructing him to use it however possible to save MCM. Although the FDIC was currently engaged in an examination of MCM, Haley did not forward a copy of his memorandum to the FDIC. On July 6, 1990 plaintiff forwarded a supplemental memorandum to Maffitt, again questioning the OTS' actions regarding MCM.
On or about July 13, 1990 Plowman gave a copy of the Haley Memo to Harold Chapman, the FDIC examiner in charge of the then ongoing examination of MCM. At some point in time, Ms. Gassert also gave a copy of the Haley Memo to Chapman. On July 17, 1990 Chapman showed his copy of the Haley Memo to Tim O'Leary; who in turn, informed Maffitt that the Haley Memo had been furnished to Chapman by Plowman. On or about July 19, 1990 the OTS undertook an investigation of Haley's disclosure of the Haley Memo to Plowman. The OTS conducted several interviews, including personal interviews of Haley, Plowman, Chapman, and Gassert.
On July 26, 1990 the OTS terminated plaintiff's employment for disclosing confidential information about OTS matters to an outside third party (Plowman). In December 1990, plaintiff appealed his discharge to the Merit Systems Protection Board (MSPB). Plaintiff claimed that his actions were protected under 5 U.S.C. § 2302(b)(8), the Whistleblower Protection Act.
On June 4, 1991 the MSPB upheld the discharge. It found that the plaintiff did not meet the requirements for protection under 5 U.S.C. § 2302(b)(8). On October 13, 1992 the Federal Circuit Court of Appeals affirmed the MSPB's decision for the same reasons.
Meanwhile, in December 1991, a year and one-half after Haley was discharged, Congress amended 12 U.S.C. § 1831j to provide protection from retaliatory discharge due to whistleblowing, not only to employees of depository institutions but also to employees of federal banking agencies, such as the OTS. The 1991 amendments were granted retroactive effect to January 1, 1987. They further provided that a cause of action, pursuant to § 1831j, was enforceable in district court only. On December 15, 1993 plaintiff filed *1091 the instant action in federal district court where it was assigned to this Court.
As for MCM, Plowman had also given a copy of the Haley Memo to Representative Harold Volkmer; who in turn, gave it to Representative Henry B. Gonzalez, (then) Chairman of the House Banking Committee. Eventually, the matter involving the Haley Memo was recorded in the Congressional Record. Shortly thereafter, a new capital plan for MCM was approved. It involved Plowman personally underwriting $150,000.00 worth of conversion costs and the FDIC agreeing to forgive the interest payable on the net worth certificates. Today, MCM is a stable viable banking institution operating in Hannibal, Missouri.
Plaintiff contends that he is entitled to damages and reinstatement pursuant to 12 U.S.C. § 1831j because he was fired for providing information to Plowman regarding possible violations of law or regulations by the OTS with regard to MCM, and Plowman, in turn, provided this information to the FDIC. Plaintiff contends that Plowman gave this information to the FDIC pursuant to plaintiff's request that Plowman use the information in whatever way possible to stop the sale or merger of MCM. Plaintiff contends that the information provided to Plowman was not confidential information but was information regarding "possible" violations of law or regulations by the OTS in the handling of MCM. Defendant contends that plaintiff's claim must fail for three (3) reasons: 1) Plowman did not give the Haley Memo to the FDIC at plaintiff's "request"; 2) the Haley Memo does not contain information as to possible violations of law; and 3) the OTS terminated plaintiff's employment because he made an unauthorized disclosure of agency information to Plowman, and such a disclosure is not protected under § 1831j.

CONCLUSIONS OF LAW
Prior to December 1991, § 1831 did not provide protection for disclosures of possible violations of law by employees of federal banking agencies like the OTS. In December 1991 Congress amended § 1831 and Section 1831j(a)(2) reads in pertinent part:
(2) Employees of banking agencies
No Federal banking agency, Federal home loan bank, Federal reserve bank, or any person who is performing, directly or indirectly, any function or service on behalf of the Corporation may discharge or otherwise discriminate against any employee ... because the employee (or any person acting pursuant to the request of the employee) provided information to any such agency or bank or to the Attorney General regarding possible violation of any law or regulation ... by
(A) any depository institution or any such bank or agency;
(B) any director, officer, or employee of any depository institution or any such bank;
(C) any officer or employee of the agency which employs such employees; or
(D) the person, or any officer or employee of the person, who employs such employee.
§ 1831j(e) defines "Federal banking agency" as including the FDIC and the Director of the Office of Thrift Supervision.
In its pretrial ruling on the parties' cross-motions for summary judgment, the Court ruled that plaintiff had met the requirements to bring his cause of action pursuant to 12 U.S.C. § 1831j. More precisely, based upon the record before the Court, the Court held that Plowman gave the Haley Memo to the FDIC at the plaintiff's "request". The Court reasoned:
"Plaintiff wanted the appropriate regulatory people and agencies (such as the FDIC) to be made aware of the suspect merger and he knew Plowman was in contact with banking regulatory people who had the power to stop the merger. For purposes of the motions, the Court accepts as true plaintiff's contention that he did not directly give the memorandum to the FDIC for fear of reprisal by his employer or the imposition of criminal sanctions. The Court does not believe the fact that plaintiff and Plowman did not discuss with particularity whom the memoranda should be given to is fatal to the plaintiff's cause of action. Plowman attests that he knew plaintiff wanted the memoranda given to *1092 someone with the power and authority to look into the merger, so he gave it to Mr. Chapman when the opportunity presented itself. The Court finds that the sequence of events, given the discussions between plaintiff and Plowman, meet the spirit and intent of Section 1831j."
Court Order and Memorandum, filed June 6, 1995, pg. 7.
The OTS requests that the Court revisit its ruling on this issue in light of the trial testimony and evidence. Defendant concedes that there is no caselaw interpreting this particular provision of § 1831j; however, it argues that the only reasonable interpretation of the "pursuant to the request" clause is that "the employee must, at the very least, make a request that the person provide the information to the protected recipient and thus make a clear decision and effort to provide information to a protected recipient." Defendant OTS' Post Trial Memorandum, pg. 20. OTS cites to the plaintiff's testimony and Plowman's testimony in which they both agree that plaintiff never specifically told Plowman to give the memo to the FDIC.
This evidence does not differ from the evidentiary record which the Court already considered in making its prior ruling on this issue. The Court concurs that Haley never specifically told Plowman to give the memo to the FDIC. However, both Haley and Plowman testified that several potential recipients of the memo were discussed. Haley testified that he himself, prior to speaking with Plowman, had considered sending the memo to several recipients outside of the OTS, including Congressman Gonzales, Senator Kit Bond, and L. William Siemann (Chairman of the FDIC). He further testified that after speaking with Ms. Gassert and Plowman, he became concerned about making direct disclosures to these people for fear of reprisal from the OTS or even criminal prosecution. He decided to send it not only to his OTS supervisors, but also to Plowman knowing that Plowman was in contact with people outside of the OTS who might be able to intercede.
After careful consideration of the matter, the Court reaffirms its earlier ruling on this issue. Courts which have been called upon to interpret different federal whistleblower statutes have uniformly held that such statutes should be broadly construed, even where the conduct involved did not come under the literal terms of the statute, in order to further their remedial purposes. Neal v. Honeywell, Inc., 826 F.Supp. 266, 270-71 (N.D.Ill.1993) (citations omitted); see also, Lao Chua v. St. Paul Federal Bank for Savings, 1995 WL 472773 (N.D.Ill.1995)[8]. This Court stands by its previous finding that under the circumstances of this case, plaintiff's actions meet the spirit and intent of § 1831j(a)(2).
Next, defendant OTS contends that plaintiff has not met the requirements of § 1831j because his true purpose in writing the Haley Memo was not to disclose possible violations of law, but rather to protest what he considered to be unfair treatment of MCM. OTS contends that the Haley Memo does not provide information as to possible violations of law but instead only expresses plaintiff's disagreement with the OTS as to its handling of MCM.
Under 12 U.S.C. § 1831j(a)(2), a federal banking agency (such as the OTS) may not discharge an employee because the employee (or any person acting pursuant to the request of the employee) "provided information to any such agency ... regarding any possible violation of any law or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety" by any federal banking agency. The statute only requires the protected employee to have "provided information" as to "possible violations of any law or regulation"; it does not require tangible evidence of specific violations of any specific law or regulation. All that is required is for the employee to show *1093 that s/he reported a possible violation. Hicks v. Resolution Trust Co., 767 F.Supp. 167, 172 (N.D.Ill.1991), aff'd 970 F.2d. 378 (7th Cir.1992); see, O'Connell v. River Forest Bank, 1993 WL 276787 (N.D.Ill.1993) (no additional statutory requirement that employee know or believe that the information provided constitutes a violation of any federal law or regulation). The credible evidence shows that Haley has met this requirement.
In his memorandum, Haley outlines several ways in which he believes that the OTS had been acting improperly, even illegally, in its handling of MCM. He asserted both in his memorandum, and at trial, that the agency acted illegally in threatening to appoint a conservator if Plowman did not sign the consent agreement because there was no impairment of statutory capital; i.e. no legal grounds existed for conservatorship because MCM was not in default on any obligation or at risk for insolvency. He asserted that the OTS was legally obligated to recognize the validity of certain Net Worth Certificates as capital and that the failure to do so was tantamount to violating contractual obligations established between MCM and the federal government, as well as an unconstitutional taking of property without due process of law. He further asserted that the OTS was violating its statutory duty to preserve the assets of the federal government by recommending forgiveness of an indebtedness for a proposed acquiror of MCM. He further asserted that OTS was violating its statutory duties by denying MCM the opportunity to engage in a stock conversion. He further asserted that although MCM qualified for an application for statutory exemption from sanctions, OTS was attempting to force a merger without allowing MCM to pursue such exemption. Finally, Haley asserted that the OTS was violating the Community Reinvestment Act by pressuring MCM into a merger with Roosevelt Bank, a banking institution with a poor loan record in the Hannibal area.
Defendant asserts that some, if not all, of these allegations were unfounded. However, the accuracy of these allegations is not the issue. All § 1831j requires is for Haley to have "provided information" about "possible violations of the law". It does not require him to draft a legal brief arguing the finer points of commercial and banking law. The Haley Memo meets the requirements of § 1831j. Undeniably, it expresses Haley's disagreement with the OTS as to its handling of MCM; but it also provides information as to possible violations of law.
Having met the basic requirements of bringing a cause of action pursuant to § 1831j does not mean that plaintiff is automatically entitled to recover his alleged damages. Plaintiff contends that he was fired because the Haley Memo was given to Plowman, who in turn gave it to the FDIC; thus, he was fired for providing information of possible violations of law by the OTS to the FDIC. The OTS contends that plaintiff was fired solely because of his unauthorized disclosure of agency information to Plowman.
Until December 1993, § 1831j did not provide for applicable burdens of proof. In December 1993, Congress amended § 1831j by providing that the legal burdens of proof that prevail under 5 U.S.C. § 1221 shall govern the adjudication of protected activities under § 1831j. 12 U.S.C. § 1831j(f). The referenced statute is the Whistleblower Protection Act, 5 U.S.C. § 1221(e) which reads in pertinent part:
Subject to the provisions of paragraph (2), in any case involving an alleged prohibited personnel practice as described under section 2302(b)(8), the Board shall order such corrective action as the Board considers appropriate if the employee, former employee, or applicant for employment has demonstrated that a disclosure described under section 2302(b)(8) was a contributing factor in the personnel action which was taken or is to be taken against such employee, former employee, or applicant.
Corrective action under paragraph (1) may not be ordered if the agency demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure.
Under this statute, a plaintiff's prima facie burden is to show that his or her whistleblowing was a contributing factor in the retaliatory action(s) taken against him or her. If the plaintiff meets this burden, then the *1094 defendant employer must demonstrate by clear and convincing evidence that it would have taken the same challenged personnel action in the absence of the subject disclosure. Rouse v. Farmers State Bank of Jewell, Iowa, 866 F.Supp. 1191, 1207 (N.D.Iowa 1994); Primes v. Parish National Bank, 1995 WL 241853 (E.D.La.1995). Thus, a trial court reviewing a claim under § 1831j must engage in a two-prong analysis: 1) the plaintiff must establish a prima facie case of retaliation by showing that his or her disclosure(s) were a contributing factor in the adverse employment decision; and if the plaintiff succeeds in establishing his or her prima facie case, then 2) the burden of persuasion shifts to the defendant employer to demonstrate, by clear and convincing evidence, that the challenged employment decision would have been made in the absence of the plaintiff's disclosure(s). Rouse, at 1208.
It appears that the burden placed upon the plaintiff in a whistleblowing case is less than the burden traditionally placed upon a plaintiff in a Title VII case; whereas the burden on the defendant employer in a whistleblower case is heightened. Rouse, at 1208. This difference is highlighted by the legislative intent behind the Whistleblower Protection Act. The legislative intent behind the WPA in lessening the plaintiff's burden is demonstrated by the fact that all a plaintiff must do is "present evidence that a protected disclosure played a role in or was a contributing factor to the personnel action taken. A contributing factor means any factor which alone, or in connection with other factors, tends to effect, in any way, the outcome of the decision. Any weight given to the protected disclosure, either alone or in combination with other factors, can satisfy the contributing factor test." Primes v. Parish National Bank, supra., citing 5 U.S.C. § 1221(e); 135 Cong.Rec. 5033 (1989); Marano v. Dept. of Justice, 2 F.3d 1137, 1140-41 (Fed.Cir.1993); see, Rouse, at 1208.
The legislative history of the WPA also indicates that in order to meet this lessened burden, a plaintiff, in order to establish his or her prima facie case, "must establish both temporal proximity and actual or constructive knowledge of the defendant of the disclosures at the time of the employment decision to meet the `contributory factor' test." Rouse, at 1209 citing Wagner v. E.P.A., 51 M.S.P.R. 337 n. 6 (1991) (citations omitted).
In the instant case, Haley has met his lessened burden of demonstrating that his disclosures (via the Haley Memo) were a contributing factor in his discharge. The trial testimony and exhibits undeniably show that Haley sent the memo to Plowman on or about July 4, 1990; that Plowman gave a copy to Chapman and Chapman informed O'Leary of the memo on or about July 13, 1990; that Maffit was informed of the memo's existence on or about July 14, 1990; that plaintiff was interviewed by Maffitt on July 23, 1990 and suspended effective July 24, 1990; that Ms. Gassert was interviewed on July 24, 1990; and finally, plaintiff was given written notice of his termination of employment on July 26, 1990. Haley has sufficiently demonstrated both temporal proximity and actual knowledge of the Haley Memo by his OTS supervisors such that a reasonable person, such as this Court, could conclude that the Haley Memo was a contributory factor in the decision to discharge him.
The OTS contends that it fired plaintiff solely because he disclosed unpublished information to an outside third party, i.e. Bayard Plowman. Both Maffitt and Harlan Halsne (Senior Manager responsible for supervision and regulation of thrift institutions in Eastern Missouri) testified that the disclosures to the FDIC was not a factor in their decision to discharge plaintiff, but rather they were upset because Haley had given the memo to the managing officer of a thrift institution presently being examined. Both men further testified that Haley's actions had raised serious concerns about his trustworthiness and objectivity. Both men testified that the disclosure to the FDIC was of little concern to the OTS because the OTS often communicates with the FDIC and shares information with it. The OTS further points out that if disclosure to the FDIC was the overriding concern, then Ms. Gassert would have been subject to disciplinary action (which she was not) for giving a copy of the Haley Memo to Chapman.
*1095 The OTS' burden is much more substantial than the plaintiff's burden (or, as a matter of fact, a defendant's burden in a Title VII case). It must demonstrate a legitimate, non-retaliatory reason for discharging Haley by "clear and convincing evidence". Defendant has not met this heightened standard of the whistleblower statutes. It is clear that the OTS was greatly concerned about Haley making his disclosures to Plowman. Without a doubt, distribution of the Memo to Plowman was one of the reasons Haley was discharged. However, defendant has failed to overcome plaintiff's prima facie case that distribution of the Memo to the FDIC was a contributory factor to the decision to discharge him. A phone message dated July 17, 1990 from O'Leary to Maffitt specifically notes that the FDIC had a copy of the Haley Memo. Chapman was extensively interviewed by Maffitt as to the circumstances surrounding his receipt of the Haley Memo. Ms. Gassert was specifically questioned as to whether she also had given a copy of the Haley Memo to the FDIC. As for Ms. Gassert not being disciplined, the Court will not second-guess the OTS' reasons for not disciplining her. However, the Court notes that, after interviewing Ms. Gassert, Maffitt concluded that she had not played a significant role in the creation or distribution of the Haley Memo. Maffitt's interview notes indicate that Ms. Gassert had only provided Haley, a fellow bank examiner familiar with MCM, with common bank examining information about MCM. Furthermore, she had counseled Haley against distributing the Memo outside of the OTS. Finally, she did not give a copy of the Memo to Chapman of her own volition; rather, she had given him a copy upon his request. Given the fact that the OTS claims that information is regularly shared with the FDIC, it would not have been unreasonable for Ms. Gassert to comply with Chapman's request. See, Defendant's Exhibits F and G; Plaintiffs Exhibit 13. It is this Court's considered opinion that the OTS has failed to show by clear and convincing evidence that the disclosure to the FDIC was not a contributory factor in the decision to discharge Haley, and that it would have discharged Haley in the absence of the disclosure to the FDIC.

DAMAGES
Plaintiff seeks back pay and benefits totalling $289,823.00[9]; and compensatory damages totaling $575,789.00. He also seeks reinstatement, or in lieu of reinstatement, compensation for loss of future wages and benefits totaling $433,610.00. Finally, plaintiff requests an unspecified amount for attorneys' fees. The OTS did not argue any objection to these figures or present any evidence which disputes these figures.[10]
The remedies available that a court may order in the event it determines that a violation of § 1831j has occurred are clearly set forth in § 1831j(c):
If the district court determines that a violation of subsection (a) of this section has occurred, it may order the depository institution which committed the violation 
(1) to reinstate the employee to his former position,
(2) to pay compensatory damages; or
(3) take other appropriate actions to remedy any past discrimination.
Clearly, then, this Court has broad discretion in fashioning any remedy it believes is appropriate given the record before this Court.
After reviewing all of the evidence before the Court, the Court determines that plaintiff is entitled to back pay and benefits, from the *1096 date of discharge through December 31, 1995[11], totaling $289,823.00.
The evidence before this Court does not substantiate the extremely large sum that plaintiff requests for loss of income on savings spent on living expenses, humiliation, emotional injury and loss of enjoyment of life, and injury to his reputation. The credible evidence is that plaintiff has been able to reasonably support himself through a variety of banking or financial-related temporary and permanent jobs. At the time of trial, plaintiff was gainfully employed at a financial institution. Although he testified that since his discharge from the OTS he has been "testy" and somewhat depressed, he has never been nor is currently under a doctor's care for depression or any mental or emotional injuries related to his firing. Finally, no evidence was offered which showed that plaintiff has suffered injury to his reputation; i.e. that his firing and reasons given are well-known in the banking community and have negatively impacted on others' opinion of his personal or professional character. Consequently, given the fact that being fired from a long-held job is in itself an upsetting experience, the Court will award plaintiff $100.00 in compensatory damages.
Finally, the Court determines that reinstatement is not a viable remedy given the circumstances of plaintiff's discharge; consequently, the Court will award plaintiff the total amount of $433,610.00 for future loss of income.
Haley also contends that he is entitled to attorneys' fees. Section 1831j(c) does not expressly provide for recovery of attorneys' fees unlike several other whistleblower statutes. See, e.g., 5 U.S.C. § 1221(g)(1)(B) (CSRA Whistleblower's Statute); 29 U.S.C. § 626(b) and 216b (ADEA Whistleblower's Statute); 29 U.S.C. § 1140 and 1132 (ERISA Whistleblower's Statute); and 42 U.S.C. 9610c (CERCLA Whistleblower's Statute); see also, Primes v. Parish National Bank, supra. Generally, attorneys' fees are not recoverable absent clear statutory authority. Key Tronic Corp. v. U.S., 511 U.S. 809, 814-16, 114 S.Ct. 1960, 1965, 128 L.Ed.2d 797 (1994); Runyon v. McCrary, 427 U.S. 160, 185-86, 96 S.Ct. 2586, 2601-02, 49 L.Ed.2d 415 (1976); Alyeska Pipeline Service v. Wilderness Society, 421 U.S. 240, 269, 95 S.Ct. 1612, 1627, 44 L.Ed.2d 141 (1975). Consequently, in the absence of any clear provision for recovery of attorneys' fees in § 1831j, this Court denies plaintiff's request for attorneys' fees.
In summary, the Court awards plaintiff $289,823.00 in back pay and benefits; $100.00 in compensatory damages; and $433,610.00 for future loss of income, together with legal interest from the date of this judgment, and applicable court costs.
For the foregoing reasons, the Court enters judgment for the plaintiff and against the defendant on the merits of the plaintiff's complaint.
NOTES
[1] Section 1831j is entitled "Depository Institution Employee Protection Remedy".
[2] Actually, plaintiff's employment began in 1977 with the OTS' predecessor, the Federal Home Loan Bank Board.
[3] In 1989 the FSLIC was abolished and its functions, including the net worth certificate program, were transferred to the Federal Deposit Insurance Corporation (FDIC).
[4] 12 U.S.C. § 1729(f)(5)(J), repealed in 1989.
[5] Credible testimony of witnesses indicates that Roosevelt Federal Savings and Loan was rumored to be one of the institutions most interested in the acquisition of MCM during the relevant time-period.
[6] Although trial testimony consistently indicated that a merger with Roosevelt was imminently planned, a definite merger with Roosevelt (or any other financial institution) had not yet been announced as the OTS' final resolution of its "problems" with MCM.
[7] Plaintiff's July 3rd memorandum will be hereinafter referred to as the Haley Memo.
[8] The parties agree, and the Court concurs, that there is a paucity of published decisions addressing 12 U.S.C. § 1831j. Under normal circumstances, this Court would be hesitant to cite unpublished decisions in support of its ultimate decision; however, given that fact that published decisions are so few regarding this particular federal statute, the Court will cite to unpublished decisions which it believes lend credible support to its findings and ultimate legal conclusions.
[9] Plaintiff's Exhibit 88 sets forth plaintiff's calculations as to his requested damages. Exhibit 88 denotes $291,259.00 as damages for loss wages and benefits. This amount includes $14,729.00 for lost OTS contributions to plaintiff's 401(k) plan and $30,000.00 for loss of 26 weeks of annual leave. However, at trial, plaintiff testified that he made two errors in his calculations for the lost OTS contributions and the 26 weeks of annual leave. The correct figures should be $14,485.00 for the OTS contributions and $31,680.00 for the 26 weeks of annual leave. Thus, Exhibit 88's total figure for loss wages and benefits should be $1436.00 less or a revised total figure of $289,823.00.
[10] The only specific objection the OTS lodges is in footnote # 4 in its post-trial brief. The OTS objects to any recovery for attorneys' fees, noting that § 1831j does not specifically provide for recovery of attorneys' fees.
[11] Since no evidence was offered which updated Exhibit 88, the Court will not order back pay and benefits subsequent to December 31, 1995.