**Rosemary FROBOSE, Plaintiff–Appellant,**

v.

**AMERICAN SAVINGS AND LOAN ASSOCIATION OF DANVILLE, a state chartered federally insured savings and loan, Defendant–Appellee.**

No. 97–1432.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 12, 1997.

Decided July 31, 1998.

Susan Bogart (argued), Chicago, IL, for Plaintiff–Appellant.

James C. Kearns, Heyl, Royster, Voelker & Allen, Urbana, IL, Karen L. Kendall (argued), Heyl, Royster, Voelker & Allen, Peoria, IL, for Defendant–Appellee.

Before CUMMINGS, ROVNER, and DIANE P. WOOD, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Rosemary Frobose lost her job with the American Savings and Loan Association of Danville, Illinois after she reported certain loan irregularities to state and federal regulators. She contends that her discharge, as well as her ouster from the association's board of directors and her status as an officer, were in retaliation for these disclosures. She filed suit pursuant to the whistleblower protection provisions of the Federal Deposit Insurance Act, 12 U.S.C. § 1831j(a), asserting a number of state law claims in addition to her federal retaliation claim. The district court granted summary judgment in favor of the association on the retaliation claim as well as the bulk of her state claims and dismissed the one surviving state claim without prejudice. Frobose challenges the entry of summary judgment on her section 1831j claim and her state-law retaliatory discharge and "false light" claims. Although we conclude that summary judgment was warranted as to her false light claim, we agree that questions of material fact precluded summary judgment on the federal and state retaliation claims. We therefore reverse in part and return the case to the district court for further proceedings.

## I.

■ As summary judgment was entered against Frobose below, we are obligated to assume the truth of the evidence she has presented and to grant her the benefit of any reasonable inferences arising from that evidence. Our recitation of the facts accordingly is one that is favorable to Frobose. *See, e.g., Held v. Held,* 137 F.3d 998, 999 (7th Cir.1998).

Frobose worked for the American Savings and Loan Association of Danville for over thirty years. She served as a loan officer for most of those years, and immediately prior to her discharge in 1992 Frobose was in charge of Federal Housing Administration home improvement loans, although her day-to-day responsibilities were not limited to these loans alone. She also served as the corporate secretary and security officer and held a seat on the association's board of directors.

Late in 1990 or early the following year, Frobose came across a loan file which lacked appropriate documentation. Frobose had neither originated nor processed the loan, which made it likely that either Rand Campbell (president and managing officer of the association) or Robert Blagg (vice-president and, like Frobose, a loan officer) had done so.

When Frobose ascertained that the loan had never been submitted to the board of directors for approval, she brought the matter to Campbell's attention. Campbell assured her that he would take care of the matter.

In mid–1991, Frobose discovered another thirty-five loan files that were missing key documents, such as the loan application, credit check, a note or lien or other security or collateral, or the credit terms. Again it appeared that the loans involved had not been disclosed to or approved by the board, and again it appeared to her that either Campbell or Blagg had originated and/or processed the loans. Frobose reported the irregularities to Campbell, who again assured her that they would be taken care of, and also to Leslie Hahne, chairman of the board of directors.

Frobose also became concerned with certain irregularities in the paperwork underlying a series of mortgage and share loans totaling in excess of $500,000 to Don and Linda Carlson. Campbell previously had retained outside counsel to assess the propriety of these loans, and Frobose believed that certain deficiencies flagged by the attorney had not been addressed. She brought her concerns to the attention of board member Thomas Meyer.

Apparently Campbell did not follow through on the loan irregularities to Frobose's satisfaction. At the January 1992 meeting of American's board of directors, Frobose advised the board that she and Campbell had been at odds over certain personnel problems—including the missing documentation in loan files handled by Campbell and Blagg—for some time.[1] She requested the board's assistance in addressing these issues because, in her view, Campbell had not dealt with them. The board declined to act, however, concluding that these were management questions that Campbell should handle. After that meeting, Frobose attempted on several occasions to discuss the loan file irregularities with individual members of the board—including board chairman

Hahne and directors Meyer and William Ingram—but in each instance was rebuffed.

When Frobose learned in March 1992 that the Office of Thrift Supervision (OTS) would be conducting a periodic review of the association's affairs in April, she decided to take her concerns about the loan irregularities and American's failure to act on them to the examiners. On April 7, 1992, Frobose met briefly with representatives of both the OTS and the Office of the (Illinois) Commissioner of Savings and Residential Finance (OCSRF). American's board of directors met the following day. At that meeting, Frobose distributed the following statement, dated April 7, to the directors:

> Fellow Board Members:
>
> For quite some time, there has existed certain matters in this office that have caused me grave concerns as director and officer. File documentation, regulations, internal control and proper management.
>
> I have attempted to bring these matters to the attention of other members and as a result have been accused of going behind the back of management and have been told that is grounds for removal.
>
> My paramount concern, as director is, and always has been, the welfare of this Association.
>
> Inasmuch as I have been unable to secure proper attention of management and board in these matters, I feel it is my fiduciary duty as director, to call these matters to the attention of the State and Federal Examiners.
>
> I regret the necessity to go outside the office, however the inter-personal situation between myself and Mr. Blagg has resulted in my inability to address these matters otherwise.

(Plaintiff's Ex. 14.) Federal and state regulators attended this meeting at the invitation of Frobose.

On the following day, April 9, Campbell wrote the following letter chastising Frobose, in part, for involving the examiners:

---

1. Although there are some indications in the record that Frobose did not specifically cite the loan irregularities during the January board meeting, her affidavit asserts unequivocally that she did. *See* Plaintiff's Ex. 1 ¶ 9.

This is to notify you that your action with regard to the involvement of State and Federal Examiners in our April 8th board meeting was both unnecessary and not in the best interest of this association. Furthermore, it is my opinion that such action was prompted not by your concern for the welfare of the institution but rather your desire to solve your own personal conflicts with other members of the staff.

Your statement dated April 7th issued to the board is, at best, misleading and, at worst, completely false. The statement implies that the board has somehow refused to consider your concerns. With the exception of your complaining about personnel problems which you raised at the January board meeting, no other items have ever been put on the agenda or brought up at regular meetings of the board. To imply that such efforts have been ignored because you are a woman is an affront to the integrity of every member of this board and does not even warrant a response.

By requesting that the examiners be present at our meeting you implied that matters concerning the Carlson mortgage and share loans would not be brought to their attention in the normal course of the examination, and that somehow this board has failed to meet its responsibility with regard to dealing with these problems. I resent the implication that as managing officer, I would even consider such action or that the remainder of the board would allow it to happen. At no time during my years as managing officer of this institution have any matters of safety and soundness been withheld from the board of directors or from the examiners.

While I respect your right as a board member to raise concerns to the examiners I question your motives and the manner in which it was done. Your action at the January board meeting and the April board meeting has brought our relationship to an all time low. Your lack of respect for me and the other members of the board certainly reduces your effectiveness as an officer and director of this institution.

I feel it is only fair to put these statements in writing so that you fully understand the basis from which future management decisions will be made.

(Plaintiff's Ex. 16.) Frobose interpreted the final paragraph of Campbell's letter as a "veiled threat of [her] termination." (Plaintiff's Ex. 17.) She circulated copies of his letter to the directors along with a cover letter of her own apprising them that she would view her termination as the type of retaliatory conduct proscribed by the whistleblower protection provisions of the FDIA. (*Id.*) She also disputed Campbell's charge that she had not previously raised her concerns with the board, noting that she had attempted to do so informally with a number of board members on multiple occasions.

Meanwhile, the OTS and the OCSRF conducted an examination at American from April 6 to April 30, 1992, and on May 27, 1992, the federal and state examiners presented their findings to the board. The OTS report (formally transmitted to American on July 14) criticized American for a variety of "unsafe and unsound practices which warrant[ed] the immediate attention of both the board of directors and management," including "unauthorized lending activity, inadequate loan documentation, and inappropriate loan administration of a problem borrower." (Plaintiff's Ex. 31 at 1). The overview stated: "Based on the concerns identified, we determined that the board of directors and management have failed to adequately exercise their fiduciary responsibilities in supervising and administrating the institution's affairs." (*Id.*) The body of the OTS report also briefly noted "serious personnel conflicts" within the institution as cause for concern. (*Id.* at 5.) Additionally, it criticized (among other things) the minutes of American's board meetings, which Frobose as secretary prepared, for lacking sufficient detail. (*Id.* at 4.) Based on its analysis, the OTS assigned American a composite rating of "3," indicating that it was considered to be in "troubled condition." (*Id.* at 2; *see also* Plaintiff's Exs. 69, 72.) American was required to enter into a supervisory agreement with the OTS "to assure OTS that unsafe and unsound practices will be corrected and will not reoccur." (Plaintiff's Ex. 30 at 1.) The

supervisor in charge of the OTS investigation encouraged the board to engage the services of a management consultant.

The outside directors of American later met and agreed to hire accountant Merrill Norton to assist the board in addressing the problems the examiners had identified. Norton in turn submitted a proposal to review current regulatory compliance problems at American and to suggest both immediate corrections as well as a compliance program aimed at preventing recurrences, to review American's investment procedures and other financial decision-making and to recommend improvements, and finally to evaluate the structure of the association, the responsibilities associated with particular jobs, and the performance of its current personnel. Norton's proposal was accepted by the board and the OTS was notified that Norton had been hired to assist the board in resolving the problems the examiners had identified.

The board also engaged attorney Robert Sharfman to negotiate changes in some of the terms of the supervisory agreement that the OTS had forwarded to the association for signature. Sharfman attended a meeting of the board on September 30 to discuss that agreement. The minutes that Frobose prepared after that meeting reflect the following exchange between Frobose and Sharfman:

> [Sharfman] [a]sked me if I talked to Washington. I said that I had. He (Sharfman) reprimanded me for doing so. Said I had a fiduciary responsibility to this board to deal with them. OTS is the enemy and I (Rosemary) was wearing the wrong shirt. I told him (when he asked me who I talked to) that I was not at the meeting to be questioned, I was there to be informed of the ups and downs of signing or not signing the Agreement. I was not on trial and was not required to answer his questions. I had a right to do all that I had done.

2. Frobose disclosed to Norton that she had taken her concerns to the OTS.

3. The four employees identifying Frobose as the source of friction may have included Campbell and Blagg; Norton's report does not make this clear. (*See* Plaintiff's Ex. 42.)

He said OTS was on the opposite team. Told him I was doing my fiduciary responsibility and I couldn't believe I had so much power that I could make a phone call and change the course of events so easily. He said it wasn't that I had power, I was impressive and persistent.

(Plaintiff's Ex. 48 at 1–2; emphasis in original.) American eventually entered into a modified supervisory agreement with the OTS on November 4, 1992.

Norton had proceeded in the meantime with his examination, which included one-on-one meetings with all of American's personnel,[2] and submitted findings to the board. (Plaintiff's Ex. 42.) Included among his proposals were a number of personnel and assignment changes. Norton recommended that a new chief executive officer be hired in Campbell's stead, but that Campbell be demoted to chief operating officer rather than let go in view of his expertise, his positive image within the community, and because the other employees and officers looked to him for leadership. (*Id.* at 4, 6.) Norton also proposed that Frobose's job be eliminated. He found that the level of activity in home improvement loans did not justify the assignment of a senior officer to that area exclusively. Other officers and employees were capable of handling these loans, Norton believed. On the other hand, Frobose's position had not been sufficiently integrated with other areas of the association's work (e.g., teller activity, mortgage lending, bookkeeping) to accommodate diversification of the responsibilities assigned to that position. (*Id.* at 7.) Norton additionally recommended that Frobose herself be terminated, because she had been consistently identified by four of the seven American employees "as the specific cause of unnecessary employee friction." (*Id.* at 8.)[3]

On October 21, 1992, the shareholders of American met to elect a new five-member board of directors.[4] The slate of nominees

4. Previously, the board had consisted of seven directors. Two of those directors, including the former chairman of the Board, Hahne, had resigned, leaving the board with only five members at the time of the election. The size of the new board was reduced to five directors in the ongoing effort to reorganize American in the wake of the adverse OTS findings.

presented for approval included Campbell as well as Norton, together with the three incumbent outside directors—Meyer, Ingram, and Robert Ewbank.[5] For the first time in fourteen years, however, Frobose's name was not included among the nominees. Frobose herself submitted a memorandum objecting to the slate, which the shareholders read but did not discuss. The shareholders approved the slate.[6] On the same date, the new directors held an organizational meeting and selected Norton to serve as president and treasurer of the association and Campbell to serve as vice-president and secretary.

At the first regular meeting of the new board, director Ingram announced on behalf of American's personnel committee that Norton would be taking over as managing officer of the association effective November 1, 1992. Ingram also indicated that further personnel changes would be discussed at the November meeting of the board.

On October 30, 1992, Campbell, notwithstanding his recent re-election to the board of directors, resigned as an officer and director of American. In a special meeting held the same day, the board accepted his resignation but agreed to continue his employment through December 1992 and to retain his services as a consultant for an additional four months (through April 1993). Campbell's change in status was disclosed to association employees on November 2. At that time, the board announced the re-instatement of Robert Blagg to the post of vice-president. Frobose learned that she would be demoted to the position of assistant loan officer and in that capacity would report to Blagg.

Campbell's letter of resignation was subsequently published in the November 6, 1992 edition of the DANVILLE COMMERCIAL NEWS. After pointing out that American was in ex-

cellent financial health, the letter to the directors explained why Campbell was leaving the association:

> [Y]ou are ... aware that we have some internal personnel problems which have been blown totally out of proportion, and have resulted in the involvement of the regulatory agencies. As a result of regulatory pressure, and without any advance notice, I was replaced as managing officer on October 21, 1992. That action, whether intended or not, leaves the erroneous public perception that 1) the institution is in financial trouble, or 2) I have been guilty of some criminal or inappropriate behavior, or 3) I have failed to perform my duties as directed by this board. None of the above is accurate and I cannot accept any plan for reorganization which leaves that impression. By accepting the position of vice-president, or any other position other than managing officer, I would be doing just that.

(Plaintiff's Exs. 60, 67.)

When American's board of directors met next on November 18, 1992, Norton recommended that Frobose be terminated. The board approved Norton's recommendation. On November 20, Norton summoned Frobose to his office and handed her a letter which provided the following explanation for her termination

> In planning the restructuring of American Savings and Loan Association, I have consolidated lending activities under the direction of one senior lending officer. This duty was assigned to Mr. Blagg, November 2, 1992.

> Based upon my review of recent lending functions Mr. Blagg was already supervising 90% of the loan volume and was therefore my choice as senior loan officer.

---

5. The slate was proposed by a nominating committee consisting of the incumbent outside directors, Meyer, Ingram and Ewbank. (Plaintiff's Ex. 50.) Campbell had appointed them to that committee at the recommendation of Meyer. (Plaintiff's Ex. 44 at 3.)

6. Director Ewbank subsequently informed Frobose that she was not re-nominated to serve on the board of directors because, in view of the

reduced size of the new board, "it should be obvious to you that ... only two officers should serve on the five[ ]member board." (Plaintiff's Ex. 58.) (Illinois law requires that a majority of the board of directors of a savings and loan association not be salaried employees of the association. 205 ILCS 105/3–4(a).) Ewbank did not explain why, however, Campbell and Norton were chosen over her.

I recommended to the Board that your position as an assistant loan officer be eliminated. The Board of Directors of American Savings and Loan Association has supported this decision. Our lending activities do not need two officers.

(Plaintiff's Ex. 81.) The letter concluded with a request that Frobose clear out her desk and turn in her keys to the building that day. She was issued pay through December 14, 1992.

In December 1992, Frobose filed suit against American. Following extensive discovery, American moved for summary judgment. The court initially denied the motion in part.

Addressing the federal whistleblower claim first, the court looked to the amended version of section 1831j for the applicable burdens of proof. As the court noted, the statute specified no burden of proof as of the date Frobose was discharged. In December 1993, however, Congress amended the statute to incorporate the burdens of proof contained in the Whistleblower Protection Act, 5 U.S.C. § 1221(e). The WPA imposes on the plaintiff the burden of establishing (1) that she made a protected disclosure and (2) that this disclosure was a contributing factor in the employer's decision to take an adverse personnel action against her. Once the plaintiff establishes these two things, her employer must prove by clear and convincing evidence that it would have taken the same action in the absence of the protected disclosure. *Id.*

Applying this burden-shifting framework, the court concluded preliminarily that Frobose had presented enough evidence to raise fact questions on both prongs of her prima facie case. The parties agreed, in fact, that Frobose had engaged in activity protected by the statute when she reported her concerns to the OTS, and there was enough circumstantial proof, in the court's view, to suggest that her disclosure may have contributed to her removal from the posts of secretary and director of American, her demotion to assistant loan officer, and her discharge.

Plaintiff's evidence shows that Campbell, Norton, and the Board of Directors—all of whom had some part in the various personnel actions affecting Plaintiff—knew of Plaintiff's disclosure to the OTS. 5 U.S.C. § 1221(e)(1)(A). In addition, "the personnel action[s] occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action[s]." 5 U.S.C. § 1221(e)(1)(B). *See Collins v. State of Illinois*, 830 F.2d 692 (7th Cir. 1987) (retaliatory discharge claim under Title VII[—] a jury could find a temporal link even though almost seven months had elapsed from engaging in a protected activity and suffering an adverse employment action).

Moreover, as in [*Marano v. Department of Justice*, 2 F.3d 1137 (Fed.Cir.1993)], Plaintiff's disclosure to the OTS caused an in-depth examination by both the OTS and the State examiners. *See Marano*, 2 F.3d at 1137. As a result of this examination, the OTS found that the Association was not in compliance with certain, applicable regulations, was engaging in some unsafe and unsound practices, and had "serious personnel conflicts within the institution [which] hav[e] a material impact on the day-to-day operations of the institution." (Def.Ex. L). In response to these findings, the Board hired Norton to evaluate and resolve the deficiencies found by the examiners. One of Norton's recommendations to resolve these problems was the discharge of Plaintiff. "In this case, then, the uncontested sequence of events demonstrates that the initial, protected disclosure, 'in connection with' the [examination] report, satisfies the 'contributing factor' requirement of the statute. The content of [Plaintiff's] disclosure gave the [Association] the reason for its personnel action" because it set the examination and resulting actions taken by the Association into motion. *Id.* at 1143. In other words, "the content of [Plaintiff's] disclosure was a contributing factor to [her discharge]." *Id.*

R. 117, *Frobose v. American Sav. & Loan Ass'n of Danville*, No. 94 C 1503, Order at 18–19 (C.D.Ill. May 9, 1996) (hereinafter, the "Summary Judgment Order") (footnotes omitted).

Turning to American's defense, the court found that factual questions precluded summary judgment as to whether the association would have declined to re-elect Frobose as an officer and director in the absence of her protected disclosures. The court agreed that American had articulated non-retaliatory explanations for her exclusion. Summary Judgment Order at 20. On the other hand, Campbell's April 9 letter to Frobose had alluded to "future management decisions [that would] be made" based on the "lack of respect" that Campbell believed she had shown to him and other members of the board by involving the federal and state examiners; and Campbell was still president and a member of the board of directors six months later when Frobose was not re-elected to her positions as secretary and director. *Id.* at 20–21. In a similar vein, Sharfman, the board's attorney, had criticized Frobose for not being a team player. *Id.* at 21. Consequently, "[b]ecause the exclusion of Plaintiff as an officer and director [was] capable of being viewed in two different lights," summary judgment was inappropriate. *Id.*

As for Frobose's demotion and discharge, however, the court believed that the record stood in a different state. American took the position that Frobose was demoted and ultimately discharged because the association did not require two senior loan officers (Frobose and Blagg), and Frobose was expendable because she did not produce sufficient loan income and her duties could be assumed by other employees. The court found that position supported by the evidence. Frobose pointed to Campbell's letter and other statements—Sharfman's, for example—as evidence that her demotion and discharge might nonetheless have been retaliatory. But the court found nothing in the record suggesting that Campbell or Sharfman had participated in the decision to discharge Frobose (Campbell, in fact, had resigned before she was terminated), and there was no evidence that Norton had ever discussed his decision to recommend Frobose's termination with them. Summary Judgment Order at 21–23, 28. And although Frobose also attempted to challenge the veracity of the reasons American had articulated for letting her go, the court determined that she had not produced

enough evidence to establish a dispute of material fact in this regard. *Id.* at 24–27. The court thus concluded that "Defendant ha[d] established by clear and convincing evidence that it would have demoted and discharged Plaintiff even if she had not made a disclosure to the OTS." *Id.* at 27. To that extent, the court granted summary judgment in favor of American as to the retaliatory nature of her demotion and discharge, while leaving it to the jury to assess whether her exclusion as an officer and director of American was in retaliation for her protected disclosures. *Id.* at 29. The court entered summary judgment in favor of American on the state-law claim for retaliatory discharge based on the same reasoning. *Id.* at 30.

Of the remaining state claims that the court proceeded to address next, only the claim of false light requires discussion at this juncture. Frobose claimed that she had been placed in a false light before the public based on a series of events culminating in her discharge, including (1) Campbell's April 9, 1992 letter to her; (2) Norton's evaluation of her work; (3) the board's directive that she commence tape recording its meetings so that the accuracy of her minutes could be checked; (4) Sharfman's statement that "OTS is the enemy and [she] was wearing the wrong shirt"; and (5) Campbell's letter of resignation, which as we have noted was published in the DANVILLE COMMERCIAL NEWS. The district court granted summary judgment in favor of American on this claim because it believed that the trier of fact could not reasonably conclude that the false light in which Frobose alleged she was placed by these acts "would be highly offensive to a reasonable person." Summary Judgment Order at 41; *see Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 180 Ill.Dec. 307, 315, 607 N.E.2d 201, 209 (1992).

American subsequently asked the district court to reconsider its decision to allow the section 1831j claim to proceed to trial insofar as it rested upon the fact that Frobose was not re-elected as an officer or director of American, and the court granted that request. The language of the statute protects only employees of a depository institution. Under Illinois law, the court noted, directors

of savings and loan associations are not hired as employees but are instead elected by members of the association, typically for a term of one year. R. 144, *Frobose v. American Sav. & Loan Ass'n of Danville*, No. 94 C 1503, Order at 11 (C.D.Ill. Aug. 29, 1996) (hereinafter, the "Reconsideration Order"), citing 205 ILCS 105/3–4. Officers, on the other hand, could qualify as employees under Illinois law, but only pursuant to a written contract with the association; otherwise, officers are chosen by and serve at the pleasure of the association's board of directors. *Id.*, citing 205 ILCS 105/3–6(d). No written contract governed Frobose's tenure as the secretary of American. Consequently, the district court concluded that neither that office nor her seat on the board of directors constituted a term or condition of her employment. Her removal from these positions was thus beyond the protection of section 1831j(a). *Id.*

All that remained at that point was a quantum meruit claim for $400.00 in unpaid director's fees. After weighing the pertinent factors of judicial economy, convenience, fairness, and comity, the court elected not to exercise supplemental jurisdiction over that pendant state-law claim, and dismissed that claim without prejudice. R. 158, *Frobose v. American Sav. & Loan Ass'n of Danville*, No. 94 C 1503, Order at 2 (C.D.Ill. Jan. 21, 1997); *see* 28 U.S.C. § 1367(c)(3); *Centres, Inc. v. Town of Brookfield, Wis.*, 148 F.3d 699, 704 (7th Cir.1998); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727–28 (7th Cir.1998), *petition for cert. filed* (U.S. July 2, 1998) (No. 98–66).

## II.

Frobose asserts on appeal that the district court failed to accord her the favorable evidentiary inferences that she was due and improperly resolved genuine issues of material fact when it granted summary judgment in favor of American on her whistleblower claim and her claim for retaliatory discharge. Frobose reasons that once the court recognized the evidence indicating that her disclosure to the OTS contributed to her exclusion

from her posts as a director and officer of the association, her demotion to assistant loan officer, and her discharge (Summary Judgment Order at 18), it should have been left for the finder of fact to decide whether American would have taken these same adverse actions against her even if she had made no disclosure. With respect to the false light claim, Frobose argues that whether the actions of which she complains would be highly offensive to the reasonable person is a question of fact which, in view of the evidence presented, cannot be resolved against her short of trial.

We turn first to the terms of FDIA. In its present form, the statute provides:

> No insured depository institution may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee . . . provided information to any Federal Banking agency or to the Attorney General regarding—
>
> (A) a possible violation of any law or regulation; or
>
> (B) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety;
>
> by the depository institution or any director, officer, or employee of the institution.

12 U.S.C. § 1831j(a). The statute was amended in 1993. The revisions to the substantive provisions of the statute have no bearing on this case.[7] However, the amendments also specified a burden of proof governing suits for retaliation; prior to 1993, the statute had been silent in that regard. The statute as amended dictates that "[t]he legal burdens of proof that prevail under subchapter III of chapter 12 of Title 5 [the Whistleblower Protection Act] shall govern adjudication of protected activities under this section." 12 U.S.C. § 1831j(f). The cited provision of the Whistleblower Protection

---

7. The amendments added the provision protecting the disclosure of "gross mismanagement," and so on. However, what Frobose disclosed to

the OTS were possible violations of law or regulations, and that type of disclosure was protected by the statute prior to the 1993 amendments.

Act, which protects the employees of federal agencies, in turn provides as follows:

> (1) [T]he [Merit Systems Protection] Board shall order such corrective action as the Board considers appropriate if the employee, former employee, or applicant for employment has demonstrated that a [protected] disclosure . . . was a contributing factor in the personnel action which was taken or is to be taken against such employee, former employee, or applicant. The employee may demonstrate that the disclosure was a contributing factor in the personnel action through circumstantial evidence, such as evidence that—
>
> > (A) the official taking the personnel action knew of the disclosure; and
> >
> > (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.
>
> (2) Corrective action under paragraph (1) may not be ordered if the agency demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure.

5 U.S.C. § 1221(e).

Do the respective burdens set out in the Whistleblower Protection Act apply to this case, when the conduct at issue here predated the amendments that incorporated them? The district court believed so, reasoning that those burdens did not impair the association's rights as they existed when Frobose was demoted and discharged, did not increase the association's liability, and did not impose any new duty on the association. Summary Judgment Order at 16; *see Landgraf v. USI Film Prods.*, 511 U.S. 244, 269, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994), quoting *Society for the Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767 (C.C.D.N.H.1814) (Story, J.). That assessment finds support in the decisions of several other district courts. *Primes v. Parish National Bank*, 1995 WL 115750 (E.D.La.1995)

(expressly finding the burdens specified in 1993 amendment applicable to pre-amendment conduct); *Haley v. Fiechter*, 953 F.Supp. 1085, 1093–94 (E.D.Mo.1997) (applying burdens to pre-amendment conduct without retroactivity analysis), *aff'd*, 138 F.3d 1245 (8th Cir.1998); *Rouse v. Farmers State Bank of Jewell, Iowa*, 866 F.Supp. 1191, 1207–08 (N.D.Iowa 1994) (same). At least one court, however, has reached the opposite conclusion. *Walleri v. Federal Home Loan Bank of Seattle*, 965 F.Supp. 1459, 1465–67 (D.Or.1997).[8]

We shall assume, without deciding, that the burdens of proof supplied by the 1993 amendment do apply retroactively to this pre-amendment case. Those burdens quite clearly make it easier for the plaintiff to make her case under the statute and more difficult for the defendant to avoid liability: the plaintiff, on the one hand, can make out a prima facie case of retaliation, and shift the burden of persuasion to the defendant, with circumstantial evidence that her disclosure was a contributing (not necessarily a substantial or motivating) factor in the adverse personnel action taken against her; and the defendant, once the burden has shifted, must prove not merely by a preponderance but by clear and convincing evidence that it would have taken the same action against the plaintiff even in the absence of her protected disclosure. *See Simas v. First Citizens' Fed. Credit Union*, 996 F.Supp. 76, 85–86 (D.Mass.1998); *Haley*, 953 F.Supp. at 1094, 1095; *Rouse*, 866 F.Supp. at 1208; *see also Marano v. Department of Justice, supra*, 2 F.3d at 1140 (discussing legislative history of Whistleblower Protection Act). American has expressly acknowledged as much (American Br. at 24, citing *Haley*), and yet (although citing *Walleri* as supplemental authority) has accepted the district court's retroactivity assessment. Much to our surprise, *Frobose*'s counsel suggested at oral argument that the district court had erred in applying the 1993 amendments retroactively. Oral argument is far too late in the day to be raising an issue that was evident at the

---

8. *Walleri* was decided more than ten months after the district court broached the issue in this case.

outset of the case. *Ricci v. Arlington Heights*, Ill., 116 F.3d 288, 292 (7th Cir.1997) (collecting cases), *cert. dismissed*, — U.S. —, 118 S.Ct. 1693, 140 L.Ed.2d 789 (1998). The plain error doctrine has an extremely narrow application to civil cases, *see, e.g., McKinney v. Indiana Michigan Power Co.*, 113 F.3d 770, 774 (7th Cir.1997), and in any event we can think of no way in which the application of the amendments resulted in any fundamental injustice to Frobose. Moreover, as we shall explain below, the evidentiary burdens that would govern in the absence of the 1993 amendments would not alter our ruling today.

[redacted] The parties agree that on the record before us, the factfinder could reasonably conclude that Frobose made a protected disclosure to the OTS and that her disclosure was a contributing factor in the decisions to exclude her from the board of directors and her position as an officer, to demote her to assistant loan officer, and to discharge her. As the district court noted, Campbell, Norton, and the board of directors, all of whom played some role in these decisions, knew that Frobose had reported her concerns to the regulators; and the adverse personnel actions themselves occurred soon enough after she did so that one could reasonably infer that her disclosure contributed to these actions. Summary Judgment Order at 18–19 (footnote omitted); *see* 5 U.S.C. § 1221(e)(1). The court also pointed out that Frobose's disclosure to the OTS had triggered an in-depth examination of the association by the OTS (as well as the State), which culminated in findings that the association was violating certain regulations, engaging in unsound practices, and suffering from conflicts among its personnel. The association had then hired Norton to address these problems, and among the recommendations that Norton made, ultimately, was the termination of Frobose's employment. *Id.* at 19, citing *Marano*, 2 F.3d at 1137. That sequence of events likewise suggested a link between Frobose's disclosure to the OTS and her discharge. Consequently, at trial, (assuming that the factfinder found a link between Frobose's disclosure and the adverse actions that followed), the burden of proof would shift to the association to prove by clear and convincing evidence that it would have taken the same actions against Frobose notwithstanding her protected disclosure. *See* 5 U.S.C. § 1221(e)(2).

[redacted] As we have noted, the district court initially concluded that a question of fact remained as to whether the association would still have removed Frobose as an officer and director in the absence of her disclosures (Summary Judgment Order at 20–21); on reconsideration, however, it agreed with the association that officers and directors are not protected "employees" under the statute and as such Frobose could not challenge her removal from these positions (Reconsideration Order at 10–11). We agree with Frobose that the court erred in so concluding, although for a reason different from the one that Frobose herself has articulated.[9]

The statute barred the association from taking adverse action against Frobose "with respect to, inter alia," the "terms, conditions, or privileges" of her employment. 12 U.S.C. § 1831j(a)(1). The use of that language reflects a congressional intent to strike at the entire spectrum of disparate treatment of whistleblowers. *See, e.g., Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (interpreting the same language in Title VII). It may be, as the association insists, that Illinois law does not treat one's status as an officer or director with a financial institution as a "term" or "condition" of her employment; we need not decide. The possibility that Frobose had no contractual entitlement to these positions did not permit the association to remove or exclude her from them in retaliation for her disclosure to the OTS. The Supreme Court

9. Frobose argues that the district court improperly cleaved a single claim alleging a sequence of retaliatory actions into two separate claims—one focusing on her removal from office and the board of directors and the other on her demotion and discharge. What we understand the court to have done, however, was simply to identify acts that it believed were beyond the protective scope of section 1831j. Courts commonly take that approach when the plaintiff has alleged multiple, discreet acts of retaliation or discrimination. *See, e.g., Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 892–95 (7th Cir.1996); *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1308–10 (7th Cir.1989).

has made just this point in the Title VII context:

> An employer may provide its employees with many benefits that it is under no obligation to furnish by any express or implied contract. Such a benefit, though not a contractual *right* of employment, may qualify as a "privileg[e]" of employment under Title VII. A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all. Those benefits that comprise the "incidents of employment," S.Rep. No. 867, 88th Cong. 2d Sess., 11 (1964) or that form "an aspect of the relationship between the employer and employees," *Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 178, 92 S.Ct. 383, 397, 30 L.Ed.2d 341 (1971), may not be afforded in a manner contrary to Title VII.

*Hishon v. King & Spalding,* 467 U.S. 69, 75–76, 104 S.Ct. 2229, 2233–34, 81 L.Ed.2d 59 (1984) (footnotes omitted) (emphasis in original); *see also Miller v. International Harvester Co.,* 811 F.2d 1150, 1151–52 (7th Cir. 1987). Thus, the fact that Frobose had no "vested right" to continued service as an officer or director (Association Br. at 15) does not preclude her from claiming that these positions were "privileges" of her employment and that her exclusion from these positions in the wake of her disclosure violated section 1831j(a)(1).[10] The association may otherwise have been free not to renominate or re-elect Frobose to office for any reason free from judicial scrutiny; it was not free to assess her fitness for office based on her status as a whistleblower, however, just as it was not free to exclude or remove her from office based on her race, sex, religion, or national origin. *See Washington v. Lake County, Ill.,* 969 F.2d 250, 256 (7th Cir.1992), *abrogated on other grounds by McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995); *and see, e.g., Bryson v. Chicago State Univ.,* 96 F.3d 912, 916–17 (7th Cir.1996) (finding that committee assignments and in-house titles can constitute tangible employment benefits for purposes of quid pro quo harassment claim).

As we have noted, the district court found that there were questions of material fact as to whether Frobose would have been re-elected to the board of directors and re-nominated as an officer had she not made the protected disclosures to the OTS. The district court's decision in this respect is sound, and the association does not challenge it. She is therefore entitled to a trial on this aspect of her retaliation claim.[11]

Factual questions also remain as to whether the association would have demoted and then discharged Frobose had she not disclosed the loan irregularities to the OTS. As we have noted, under the express terms of amended section 1831j, once the plaintiff has succeeded in showing that her protected disclosures contributed to the defendant's decision to take adverse action against her, the burden shifts to the defendant to prove by clear and convincing evidence that it would have taken the same action against her absent the protected conduct. *See* 5 U.S.C. § 1221(e)(2). The burden shifted to the defendant is one of persuasion, not simply one of production. *Haley,* 953 F.Supp. at 1094; *Rouse,* 866 F.Supp. at 1208; *cf. Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 258, 109 S.Ct. 1775, 1787–88, 1795, 104 L.Ed.2d 268 (1989) (Title VII) (plurality); *id.* at 259–

---

10. American notes that service as an officer of a financial institution is not limited to employees but is instead open to the public at large. So far as the record reveals, however, each of American's officers was, in fact, an employee of the association. We see no reason why the finder of fact could not conclude that service as an officer and/or as an inside director was a benefit that became part and parcel of Frobose's employment relationship with American notwithstanding the fact that American had no obligation in the first instance to offer those positions to her.

11. American argues alternatively that Frobose cannot obtain relief for her exclusion as an officer and director because in those capacities she participated in the acts that she reported to the regulators. *See* 12 U.S.C. § 1831j(d)(1) ("[t]he protections of this section shall not apply to any employee who—(1) deliberately causes or participates in the alleged violation of law or regulation"). To the extent Frobose may indeed have participated in any violations, we believe that questions of fact remain as to whether her participation was deliberate.

60, 109 S.Ct. at 1795, 109 S.Ct. 1775 (White, J., concurring); *id.* at 261, 266–67, 109 S.Ct. at 1796, 1799 (O'Connor, J., concurring); *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 658 (7th Cir.1991) (en banc) (ADEA); *Bristow v. Drake Street Inc.*, 41 F.3d 345, 353 (7th Cir.1994) (Title VII). Here, the district court concluded that the association had proven by clear and convincing evidence that it would have demoted and terminated Frobose even if she had not gone to the OTS. Of course, the weight of the evidence was not something that the district court could properly assess on summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255, 106 S.Ct. 2505, 2510–11, 2513, 91 L.Ed.2d 202 (1986); *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 297 (7th Cir.1998); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994). The sole question before the court here was whether there was a question of fact outstanding as to what action the association would have taken in the absence of Frobose's whistleblowing. *See generally Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). Given that the burden of proof on this point is assigned to the defendant, *see* 5 U.S.C. § 1221(e)(2), and questions of intent and credibility will often be raised, *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993), particular care must be taken to resolve all doubts in favor of the plaintiff. *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 893 (7th Cir.1996). So long as the finder of fact could reasonably conclude that the association treated Frobose more harshly after she reported the irregularities than it would have otherwise, Frobose was entitled to a trial. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1402 (7th Cir.1996).[12]

The association posits that Frobose's demotion and discharge were the inevitable result of the reorganization prompted by the OTS investigation. Several circumstances, however, leave room for the inference that Frobose's whistleblowing sealed her fate.

First, on April 8, 1992—the day after the board meeting at which Frobose announced her disclosures to the OTS—Campbell wrote Frobose a letter chastising her and ending with the admonishment that "it is only fair to put these statements in writing so that you fully understand the basis from which future management decisions will be made." (Plaintiff's Ex. 16.) Campbell wrote that letter as American's president, and his reference to "future management decisions" reasonably could be construed as an official[13] and not-so-veiled threat of retaliation.[14] It is

**12.** Summary judgment is most often entered *against* the party bearing the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) ("the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *see also Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 567 n. 3, 112 S.Ct. 2130, 2140 n. 3, 119 L.Ed.2d 351 (1992). This court has pointed out that there are cases in which summary judgment is granted *in favor of* the party bearing the burden of persuasion, *Visser*, 924 F.2d at 660 (collecting cases), although we did not find it necessary to identify the precise circumstances under which this will be appropriate, *id.* In his *Visser* dissent, however, Judge Flaum cautioned that such cases will be "rare." *Id.* at 662. We have more recently noted that once the plaintiff has presented direct evidence that a forbidden factor contributed to the employer's decision to take adverse action against her, a trial will normally be necessary in order to determine whether the employer would have taken the same action in the absence of the illicit consideration. *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir.1997). Only if the evidence "points inescapably" in the employer's favor, *Visser*, 924 F.2d at 662 (Flaum, J., dissenting), leaving no room for the factfinder to infer that the employer in fact discriminated or retaliated against the plaintiff, *Venters*, 123 F.3d at 973, will the employer be entitled to summary judgment. *See also Veprinsky*, 87 F.3d at 893–94; *Adler v. Madigan*, 939 F.2d 476, 479 (7th Cir.1991) (observing that mixed-motives cases "are ordinarily not grist for the summary judgment mill").

**13.** Indeed, Campbell's letter included a signature line on which Frobose apparently was expected to (and did) acknowledge receipt, a circumstance which tends to confirm the official character of the letter. (Plaintiff's Ex. 16.)

**14.** Although Frobose subsequently circulated a copy of Campbell's letter to the members of the Board along with her own letter indicating that she construed Campbell's words as a threat that she would be discharged, there is no evidence

true, of course, that Campbell resigned as an officer and director of the association on October 30, 1992. Frobose herself was not demoted until November 2, 1992 and discharged until November 20, and these actions were taken upon Norton's recommendation. But Campbell had remained at the helm of the association throughout the period of Norton's consultancy; in fact he had been re-elected to the Board on October 21—the same date that Norton himself was elected to the Board. Naturally that leads one to wonder whether Campbell might have laid the foundation for Frobose's ouster before he himself departed—voluntarily—from the association. Indeed, as Frobose points out, there is some evidence in the record that her discharge was discussed long before November—as early as June of 1992, in fact. (*See* Plaintiff's Ex. 99 at 27–29, 31–32.)

Second, there is evidence suggesting that the animus against Frobose was not limited to Campbell, but included other members of American's board of directors. We note that the Board's attorney allegedly remarked to Frobose in the wake of her whistleblowing, and in the presence of both Norton and the board, that the regulators were the enemy and that she was "wearing the wrong shirt." (Plaintiff's Ex. 48 at 1.) He was apparently not alone in viewing Frobose as American's adversary. The minutes of a prior board meeting indicate that one of the outside directors interrupted a discussion of the adverse OTS findings to remark, "Let's cut the crap. Rosemary brought charges, so where are we?" (Plaintiff's Ex. 25 at 7.)[15] Moreover, according to Frobose, Norton also remarked to her more than once that the board perceived her to be the only factor differentiating the (favorable) 1989 examination of American's affairs from the (unfavorable) 1992 examination. (Plaintiff's Ex. 1 ¶ 16.)[16] Any animus harbored by the directors is material, not only because the board hired Norton and charged him with the reorganization of the association, but also because the

board was asked to approve Frobose's discharge. (Plaintiff's Ex. 79 at 2.)

Third and finally, a factfinder could discern a telling disparity in the way that Frobose was treated compared with Campbell and Blagg, the two officers singled out by name for criticism in the OTS report. (*See, e.g.,* Plaintiff's Ex. 31 at 6, 8, 15.) Campbell was demoted but not discharged (and as we have noted he was re-elected to the board of directors), while Blagg was eventually reinstated to the post of vice-president. Only Frobose was terminated. *See Visser,* 924 F.2d at 662 & n. 1 (Flaum, J., dissenting) (noting that proof of disparate treatment will enable the plaintiff to survive summary judgment even when the employer presents a "compelling," legitimate reason for her discharge).

We have not attempted to lay out an exhaustive list of the facts bearing on the reasons for Frobose's demotion and discharge. We have cited these circumstances simply to demonstrate that the record does not eliminate all doubt as to whether American could persuade the finder of fact by clear and convincing evidence that it would have demoted and discharged Frobose even if she had not engaged in behavior protected by the statute.

For the record, we note that summary judgment would have been inappropriate even if the amendment incorporating the burden-shifting framework of the Whistleblower Protection Act were disregarded. When a non-discrimination or anti-retaliation statute says nothing about the burden of proof (as section 1831j did prior to the 1993 amendment), we have looked to Title VII case law for guidance. *See, e.g., Kahn v. U.S. Secretary of Labor,* 64 F.3d 271, 277 & n. 7 (7th Cir.1995) (applying whistleblower provisions of Energy Reorganization Act, 42 U.S.C. § 5851). Thus, when the plaintiff has no direct evidence that her protected activities contributed to an adverse employment action, we have invoked the *McDonnell Douglas* framework. *McDonnell Douglas*

---

that the Board took any steps to distance itself from Campbell's letter or to assure Frobose that she would not be penalized for her protected activity.

**15.** We should point out that the board meeting minutes reflecting these remarks were prepared by Frobose herself.

**16.** Norton vehemently denies making such a statement. (Plaintiff's Ex. 102 at 151.)

*Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *see, e.g., Weigel v. Target Stores,* 122 F.3d 461, 465 (7th Cir.1997). But in this case there is direct evidence that a prohibited consideration—Frobose's whistleblowing—was not simply a "contributing" factor (5 U.S.C. § 1221(e)(1)) but a motivating factor in the adverse employment actions that followed. *See Marano v. Department of Justice, supra,* 2 F.3d at 1140 (noting the distinction). This includes, most prominently, Campbell's letter alluding to the "future management decisions" that would be made in view of her disclosures to the regulators. *See Venters v. City of Delphi,* 123 F.3d 956, 973–74 (7th Cir.1997). The Supreme Court has held that direct evidence of this kind in a Title VII case shifts to the defendant the burden to prove that it would have taken the same adverse employment actions against the plaintiff even if the forbidden factor had played no role in its decisionmaking. *Price Waterhouse v. Hopkins, supra,* 490 U.S. at 244–45, 258, 109 S.Ct. at 1787–88, 1795 (plurality); *id.* at 259–60, 109 S.Ct. at 1795 (White, J., concurring); *id.* at 261, 266–67, 109 S.Ct. at 1796, 1799 (O'Connor, J., concurring); *see also* 42 U.S.C. § 2000e–2(m). That is precisely what the FDIA as amended requires the defendant to show.[17] And as we have previously observed, "[t]he persuasiveness of that showing will normally be for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Venters,* 123 F.3d at 973, citing *Veprinsky v. Fluor Daniel, Inc., supra,* 87 F.3d at 893; *see also* n. 12, *supra.* For the reasons we have just discussed, we are not persuaded that American's proof on this point is so compelling as to remove all doubt regarding the course of action it would have taken had Frobose not complained to the examiners.

The district court therefore erred in granting summary judgment in favor of American on the section 1831j claim. We must assume, consistent with the evidence Frobose has presented, that her disclosures to the OTS did contribute to the adverse actions American subsequently took against her. If the factfinder credits Frobose's case on this point, then it must assess whether American has proven by clear and convincing evidence that it would have taken the same actions against Frobose even if she had not blown the whistle on the irregularities in American's lending practices.

The district court granted summary judgment in favor of American on Frobose's state-law claim for retaliatory discharge for the same reason that it had disposed of that component of her section 1831j claim—that is, because American had satisfied the court that it would have discharged Frobose for legitimate business reasons even if she had not engaged in whistleblowing. Summary Judgment Order at 30. In view of our conclusion that genuine issues of material fact remain in this regard, we reverse the entry of summary judgment on this claim as well.

■■■■ We affirm, however, the district court's decision to enter summary judgment in favor of American on the false light claim. A defendant commits this particular privacy tort when he "gives publicity to a matter concerning another that places the other in a false light." 3 RESTATEMENT (SECOND) OF TORTS § 652E, at 394 (1977) (the "RESTATEMENT"), quoted in *Lovgren v. Citizens First National Bank of Princeton,* 126 Ill.2d 411, 128 Ill.Dec. 542, 544, 534 N.E.2d 987, 989 (1989). To prevail on this claim, the plaintiff must prove that (1) the defendant placed the plaintiff in a false light before the public; (2) the false light would be highly offensive to a reasonable person; and (3) the defendant acted with knowledge of or reckless disregard for the falsity of the statements in issue—in other words, with actual malice. *Kolegas v. Heftel Broadcasting Corp., supra,* 180 Ill.Dec. 307, 607 N.E.2d at 209–10. As the Illinois Supreme Court has noted, "the heart of this tort lies in the publicity." *Lovgren,* 128 Ill.Dec. at 544, 534 N.E.2d at 989. The RESTATEMENT explains that "a matter is made public[ ] by communicating it

---

**17.** Section 1831j, of course, requires the defendant to so establish by clear and convincing evidence, rather than a preponderance. Compare 5 U.S.C. § 1221(e)(2) with *Price Waterhouse,* 490 U.S. at 254, 109 S.Ct. at 1793 (plurality).

to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." RESTATEMENT § 652D, cmt. a, at 384; *see also id.* § 652E, cmt. a, at 394. Most of the statements or actions that Frobose has cited as the basis for her claim (*see* Frobose Br. at 42–43; Summary Judgment Order at 35–39, 40)—Campbell's April 9, 1992 letter to her, for example—would appear not to constitute actions that communicated falsehoods to the public at large. They were instead communications and actions between and among the employees, officers, and directors of the association, who by virtue of their positions would have a natural interest in, if not a responsibility to know about, the matters communicated. As such, these acts would not support a false light claim. *See Pace v. Bristol Hosp.,* 964 F.Supp. 628, 631–32 (D.Conn.1997); *Stewart v. Pantry, Inc.,* 715 F.Supp. 1361, 1369–70 (W.D.Ky.1988); *cf. Krochalis v. Insurance Co. of N. Am.,* 629 F.Supp. 1360, 1371–72 (E.D.Pa.1985) (statements made at staff meeting became common knowledge throughout entire insurance industry). The sole exception would be the letter of resignation that Campbell apparently forwarded to the DANVILLE COMMERCIAL NEWS for publication. But that letter, as American points out, makes no mention of Frobose by name or by any other description that would make her readily identifiable to the public. *See Vantassell–Matin v. Nelson,* 741 F.Supp. 698, 709–10 (N.D.Ill.1990); *Aroonsakul v. Shannon,* 279 Ill.App.3d 345, 216 Ill.Dec. 166, 170–71, 664 N.E.2d 1094, 1098–99 (1996). Frobose has not attempted to explain why, in light of that omission, Campbell's letter of resignation would nonetheless constitute a viable basis for a false light claim. Her discussion of this claim, in fact, is wholly devoid of citation to any authority. *See* FED. R.APP. P. 28(a)(6); *e.g., LINC Fin. Corp. v. Onwuteaka,* 129 F.3d 917, 921–22 (7th Cir. 1997). Given the evident problems with this claim and Frobose's failure to support her argument with reference to any of the parameters identified in the RESTATEMENT or in the Illinois cases, we believe the district court was correct in entering summary judgment.

## III.

For the reasons discussed above, we RE-VERSE the grant of summary judgment in favor of American on Counts I (section 1831j) and II (retaliatory discharge) of the amended complaint, AFFIRM the grant of summary judgment on Count VII (false light), and REMAND for further proceedings consistent with this opinion. In view of the reinstatement of Frobose's federal whistleblower claim, we also VACATE the dismissal of her quantum meruit claim (Count III) insofar as it seeks unpaid director's fees. The parties shall bear their own costs of appeal.