168 F.3d 998
 79 Fair Empl.Prac.Cas. (BNA) 311,
75 Empl. Prac. Dec. P 45,824
Lincoln SHEPHERD, Jr., Plaintiff-Appellant,
v.
SLATER STEELS CORPORATION, Fort Wayne Specialty Alloys
Division, Defendant-Appellee.
 No. 97-3265.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 20, 1998.
Decided Feb. 19, 1999.
 
 Christopher C. Myers (argued), Myers & Geislemen, Fort Wayne, IN, for Plaintiff-Appellant.
 Steven L. Jackson, Gary D. Johnson (argued), Baker & Daniels, Fort Wayne, IN, for Defendant-Appellee.
 Before BAUER, RIPPLE and ROVNER, Circuit Judges.
 ILANA DIAMOND ROVNER, Circuit Judge.
 
 
 1
 Lincoln Shepherd, Jr., filed this Title VII action against his former employer, Slater Steels Corporation, contending that the sexually-charged remarks and behavior of his co-worker, Edward Jemison, had rendered his work environment hostile and that Slater had ultimately discharged him in retaliation for complaining of Jemison's harassment. See 42 U.S.C. §§ 2000e-2(a), 2000e-3(a); Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). The district court entered summary judgment in favor of Slater. We affirm in part, reverse in part, and remand for a trial on Shepherd's hostile environment claim.
 
 I.
 
 2
 As this case was decided below on summary judgment, we owe Shepherd a favorable recitation and construction of the facts. E.g., Frobose v. American Sav. & Loan Ass'n of Danville, 152 F.3d 602, 604 (7th Cir.1998). Consequently, although Jemison and other defense witnesses have denied many of Shepherd's allegations, we have adopted Shepherd's account of the facts whenever it conflicts with Slater's version. The district court omitted from its own summary of the facts a number of allegations from Shepherd's affidavit, which the court believed were inconsistent with Shepherd's deposition. As we shall explain later, we believe that the court erred in excluding those averments; we have therefore included them in the following summation of events.
 
 
 3
 Slater assigned Shepherd to the position of BP Stocker in approximately 1994, after Shepherd had been with the company for two years or so. In this new position, Shepherd worked alone with Jemison. Jemison was sixty-four years old when the alleged events at issue in this litigation took place.
 
 
 4
 According to Shepherd, Jemison began to harass him in or around November 1995.[1] On a number of occasions, Jemison told Shepherd that he was "a handsome young man." Shepherd Dep. 63. Shepherd at first ignored the compliment, "because old people usually tell you that." Id. Events took a more ominous turn, however, when Jemison began, in view of Shepherd, to "sit there and play with himself" (that is, to handle his penis) and "to make it go down his leg." Shepherd Dep. 63. This was something that occurred "constantly" (Shepherd Dep. 66), "maybe four or five times a week" (id. at 63). Shepherd would typically ask Jemison what was wrong with him and walk away when he engaged in this behavior. But the harassment only escalated.
 
 
 5
 On one occasion in November or December, Shepherd was sitting in a swivel chair in the work area that he shared with Jemison. Jemison was nearby but at first not within Shepherd's view. When Shepherd eventually turned in the chair to look at Jemison, he was confronted with the sight of Jemison's exposed penis being wagged inches from his face. Shepherd Aff. p 12; Shepherd Dep. 65. Shepherd fled to the bathroom. He subsequently complained of the incident to a co-worker, Georgiana Brooks. Id.
 
 
 6
 On another occasion in December, Shepherd was lying face-down on a bench in his work area in an effort to alleviate a bout of stomach cramps. When Shepherd looked up, he saw Jemison "rubbing himself into an erection," watching Shepherd. Shepherd Aff. p 13. Jemison told Shepherd, "[I]f you [don't] turn over, [I'm] liable to crawl up on top of [you] and fuck [you] in the ass." Shepherd Dep. 66-67; Shepherd Aff. p 13. Jemison remarked to Shepherd on yet another occasion that "[a] man can come if he's fucked in the ass." Id.
 
 
 7
 Shepherd had previously complained of Jemison's behavior only to his wife and co-workers (see Shepherd Dep. 66-68), but after the December incident on the bench, he voiced his concerns to his superiors. On or about January 4, 1996, Shepherd informed his department manager, Wally Martin, of the harassment, and Martin in turn reported it to Joe Jordan of the company's Human Resources Department. Shepherd Dep. 48. Jordan summoned Shepherd to his office, where Shepherd described the various acts of harassment and how they affected him. Shepherd Aff. p 3. Jordan indicated that he would speak to Jemison.
 
 
 8
 Two or three days after his meeting with Shepherd, Jordan confronted Jemison with Shepherd's allegations. Judging from Shepherd's account of what occurred next, the meeting did not have a salutary effect. According to Shepherd, when Jemison arrived at their work area following the meeting, he immediately dropped his pants. "He took his thumb and shoved it up in his rear-end and look[ed] at me and flicked it like he had something on it that would flick off, off his finger onto me." Shepherd Dep. 69; Shepherd Aff. p 4. Shepherd immediately telephoned Jordan to report what Jemison had done. Jordan asked Shepherd whether Jemison had really done what Shepherd had just described, and Shepherd assured Jordan that he had. Shepherd Dep. 70; Shepherd Aff. p 4. Jordan advised Shepherd not to pay any attention to the conduct and to try to carry on with his work. Shepherd Dep. 70; Shepherd Aff. p 4.
 
 
 9
 From this point on, according to Shepherd, "Jemison's harassment grew progressively worse and hostile." Shepherd Aff. p 5. "[I]t was pretty much every day." Shepherd Dep. 70. On one occasion, Jemison got out of the machine he was operating, stood in front of Shepherd's forklift, "dropped his pants to his ankles, and when he bent down to pick them up, he look[ed] at me and gave me this snicker." Shepherd Dep. at 70-71. On another occasion, possibly in January 1996 (see Shepherd Dep. at 68), Shepherd explained to Jemison that he was moving slowly at work that day because of a fall he had taken while four-wheeling with a friend. Jemison asked whether he could take Shepherd and give him "a nice hot shower," promising Shepherd that it would make him feel better. Shepherd Dep. 68-69; Shepherd Aff. p 13. Shepherd's response was "Hell no." Shepherd Dep. 69. It appears that Jemison also continued to expose himself to Shepherd on a regular basis. Shepherd Aff. p 15; Shepherd Dep. 66; see also Shepherd Aff. p 17. In one variation of that routine, Jemison "cocked his leg like a dog would take a leak, you know, and he grabbed his thing and shook it at the same time." Shepherd Dep. 94. "[Jemison] also used to brag that his dick was registered downtown. It's on paper downtown because it's gotten him in trouble once before. That he had the sex life of his twin brother that died." Shepherd Dep. 74.[2]
 
 
 10
 The harassment also included a variety of conduct that was not sexual in nature. Shepherd testified, for example, that "[Jemison] would always put his thumb up his nose, like he got snot on it, and fling it at me." Shepherd Dep. 70. Periodically, Jemison would attempt to drive his machine into Shepherd's forklift. Shepherd Dep. 72.
 
 
 11
 Shepherd insists that he continued to complain about Jemison's harassment, without effect, long after his initial meeting with Jordan. Martin and Jordan heard from Shepherd regularly. See Shepherd Aff. p 10; Shepherd Dep. 57, 154-55, 158; see also Shepherd Dep. 33, 41, 94. "After January 16, 1996," Shepherd recounts, "I called Jordan approximately once every two weeks until my termination. I complained to Martin just about any time I saw him, but since he was department manager, I only saw him to speak directly with him every three or four weeks." Shepherd Aff. p 11. At one meeting with Shepherd, Martin admitted to him that co-worker Thomas Swain had also complained about Jemison exposing himself; on another occasion, either Martin or Jordan acknowledged that fellow employee Charlie Walker had lodged the same complaint. Shepherd Aff. p 9. Martin told Shepherd in February 1996 that he " 'should kick Jemison's ass,' just so long it was outside on Taylor Street off company property." Shepherd Aff. p 10.
 
 
 12
 Neither Martin nor Jordan was apparently willing to do anything more on Shepherd's behalf, however, although Jordan continually reassured Shepherd that something would happen and urged him to "hang in there." Shepherd Dep. 74; see also Shepherd Dep. 158. After one of Jemison's periodic efforts to collide with Shepherd's forklift resulted in a heated exchange and the intervention of their supervisor, Martin and Jordan told Shepherd that he would have to either continue putting up with Jemison or request another job assignment. Shepherd opted not to seek reassignment because he did not see himself as being at fault, and he did not want to take a job that would pay him less. Shepherd Aff. p 8.
 
 
 13
 Events came to a head one day in late March 1996, approximately one week after Shepherd filed a sexual harassment charge with the EEOC. Jemison had "grabbed himself" in front of Shepherd yet again that morning. Shepherd Aff. p 17. Later that day, in the midst of a telephone conversation with his sister, Shepherd put the telephone down for a moment to turn over some steel ingots. While Shepherd was dealing with the ingots, Jemison got out of his grinder machine, hung up the phone, and stood smiling at Shepherd. Shepherd uttered an expletive at Jemison and walked toward his forklift. Jemison followed him, remarking that he was going to "kick [his] ass." When Shepherd turned to face Jemison, Jemison took a swing at him with a 4 by 4 block of wood. Shepherd broke his thumb in an effort to grab the wood. When Jemison took a second swing at him, Shepherd parried with a steel bar that he picked up nearby. After Shepherd succeeded in knocking the wood from Jemison's hand (Jemison's hand was gouged in the process), Jemison charged him and Shepherd ran to another area of the building. Both men were sent home that day; both also sought medical treatment as a result of the injuries they suffered during the altercation. Id.; Shepherd Dep. 89.
 
 
 14
 Jemison and Shepherd subsequently offered completely contradictory accounts of their altercation to the company, and after ascertaining that there were no witnesses to the incident, Slater decided to discharge both men.
 
 
 15
 The union representing Shepherd and Jemison subsequently negotiated a "last chance agreement" for each of them which would have allowed them both to return to work and which also would have separated the two. Had he signed the agreement, Shepherd would have returned to work as a crane operator, the job assignment he had held before he began work with Jemison. Shepherd refused to sign the agreement, believing that he was not responsible for the fight and because he believed that the agreement interfered with his Title VII rights. Shepherd Aff. pp 18, 19. Returning to work as a crane operator would also have meant a decrease in his pay. Shepherd Dep. 96. Shepherd and his attorney proposed an alternate "last chance" agreement, but the vice-president of the union told him that this was a "take it or leave it" opportunity. Shepherd Aff. pp 19, 20. Because he was unwilling to sign the agreement as negotiated by the union, Shepherd never returned to Slater's employ. Shepherd saw a psychiatrist for approximately two months following his termination. Id. p 21. Jemison signed the agreement proposed for him and was still working for Slater when this suit was filed. Spadafora Dep. 28.
 
 
 16
 The record includes evidence that Jemison exposed himself to other men at Slater, consistent with what Shepherd claims to have been told by Martin and/or Jordan. See supra at ----. Thomas Swain was talking on the telephone on one occasion and noticed Jemison's penis "hanging out." Swain Dep. 8. In April 1995, Don Nevil had occasion to be present when Jemison's "pants were down around his ankles and his penis was in his hand." Nevil Aff. p3. Nevil says that he spoke to both the union and to Martin about the incident but that his complaints fell upon deaf ears. Id. pp 5-6. Swain and Nevil were among the individuals that Shepherd suggested Jordan contact in his investigation of Shepherd's complaints (see Shepherd Dep. 52-53; Jordan Dep. 9). Swain testified that he described the incident he had witnessed to Jordan (Swain Dep. 8), but Jordan testified that Swain refused to talk to him. Jordan Dep. 10-11. Nevil averred in an affidavit that Jordan had never contacted him at all. Nevil Aff. p 8; see also Jordan Dep. 11-12.
 
 
 17
 Shepherd also testified that Jemison had "played with it" in front of a female co-worker, Regina Harris. Shepherd Dep. 113. Beyond that testimony, however, the record reveals nothing about the details of that incident.
 
 
 18
 At the close of discovery, Slater moved for summary judgment and the district court granted that motion. Shepherd had failed to demonstrate that any harassment he suffered was based on his gender, the court reasoned, because there was evidence in the record that Jemison had engaged in sexual conduct in front of female as well as male workers. Order at 9-10. Shepherd had therefore failed to make out a prima facie case of sex discrimination. Id. at 10. Moreover, disregarding certain averments in Shepherd's affidavit that it deemed inadmissible, the court also found that Slater had investigated Shepherd's complaints promptly and that the harassment did not continue beyond the period of the company's investigation. Id. at 10-15. Consequently, the company could not be liable for the harassment. Id. Finally, the court found no evidence that Slater's decision to discharge Shepherd was retaliatory. There was no dispute that Shepherd and Jemison had engaged in a serious altercation on company premises, and in the court's view, Shepherd's participation in that fight constituted a legitimate, nondiscriminatory reason for Shepherd's termination. "This court does not sit as a super-personnel department and, in accordance with Seventh Circuit policy, does not undercut an employer's legitimate business decisions without evidence of discriminatory intent, even if the decision is arguably wrong." Order at 17-18.[3]
 
 II.
 A.
 
 19
 Shepherd alleges that he was harassed by a coworker rather than a supervisor. Consequently, in order to hold Slater liable under a hostile environment theory, Shepherd must establish that Slater knew or had reason to know about the harassment and failed to take appropriate remedial measures. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 2267, 141 L.Ed.2d 633 (1998); Adusumilli v. City of Chicago, 164 F.3d 353, 358-59 (7th Cir.1998), citing Baskerville v. Culligan Int'l Co., 50 F.3d 428, 431-32 (7th Cir.1995); Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 446 (7th Cir.1994); 29 C.F.R. § 1604.11(d); see also Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 2284, 2289, 141 L.Ed.2d 662 (1998). This is where Shepherd's case faltered, in the district court's view.
 
 
 20
 As the court read the record, all of the alleged acts of sexual harassment occurred before Slater concluded the investigation prompted by Shepherd's complaints. At his deposition, Shepherd opined that the company's investigation lasted no more than two weeks, although he added that the company had never told him the investigation was over and Jordan, in fact, had continued to assure him that something would be done. Shepherd Dep. 74. Shepherd also testified that the acts of harassment he had described had all occurred either prior to the late-December "shutdown" for the holidays or "during the period of investigation." Id.; see note 5, infra. The district court thus reasoned that the harassment did not extend beyond the two-week lifespan that Shepherd had attributed to the investigation. Order at 14-15. There was, the court concluded, no admissible evidence that Shepherd had brought any later acts of harassment to Slater's attention. Id. at 15.
 
 
 21
 The record could only be so construed, however, after certain key allegations in Shepherd's affidavit were ignored. The affidavit alleges first that Shepherd continued to complain to Martin and Jordan of Jemison's harassment on a regular basis up to the date of his discharge in March 1996. Shepherd Aff. pp 6, 10, 11. Accepted as true, that allegation is a strong hint that Jemison's alleged misdeeds continued well beyond Shepherd's initial complaint and the company's immediate follow-up. Why else would Shepherd have continued to complain? The affidavit also alleges that as far as Shepherd was aware, the company's investigation continued until his termination (Shepherd Aff. p 11)--a much longer period of time than the initial two-week estimate that Shepherd had offered at his deposition (Shepherd Dep. 74). When read together with Shepherd's deposition testimony that all of the pertinent acts of harassment took place before the company concluded its investigation (id.), this averment suggests that the harassment Shepherd described extended well beyond the first two weeks of the company's investigation. Because the affidavit in this way appears to broaden the time period during which the alleged harassment occurred, the district court viewed the affidavit as an improper effort to contradict Shepherd's deposition testimony. See Adusumilli v. City of Chicago, supra, 164 F.3d at 358; Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir.1995).
 
 
 22
 [T]he fact remains that Shepherd admitted [at the deposition] that he knew the investigation ended approximately two weeks after he reported the harassment. Shepherd further admitted that all acts of alleged harassment occurred during the investigation period. Thus, his affidavit testimony does, in fact, contradict his deposition. Consequently, Shepherd's affidavit, insofar as it contradicts his deposition, will be ignored.... The admissible evidence ... shows that any alleged harassment stopped after Slater's investigation and Jordan's warning to Jemison.
 
 
 23
 Order at 14-15 (footnote omitted).
 
 
 24
 Shepherd's deposition testimony is open to more than one reading, however. When read as a whole and in his favor, that testimony suggests that Jemison's harassment persisted through the date of Shepherd's discharge.
 
 
 25
 First, although Shepherd voiced the suspicion[4] at his deposition that the company's investigation had lasted no more than two weeks, he promptly qualified his initial remark:
 
 
 26
 Q. .... Based on your recollection of the events during that period of time, when did the harassment investigation end?
 
 
 27
 A. I believed it ended like maybe two weeks afterwards that they started it.
 
 
 28
 Q. Two weeks after the investigation started?
 
 
 29
 A. Well, they never told me that it ended. But Mr. Jordan just kept telling me that something was going to happen. He can't tell me when, but just hang in there. Something's going to happen, is what I kept getting told.
 
 
 30
 Q. Okay. And all of the events that you've described for me, which you believe are harassment, occurred before shutdown[5] and during the period of investigation; correct?
 
 
 31
 A. Exactly....
 
 
 32
 Shepherd Dep. 74. It is plain from this passage that Shepherd believed the company did nothing of substance to investigate or remediate his complaint after two weeks; but it is equally evident that the company line (as Shepherd described it) was different--no one told Shepherd that the investigation was over, and Jordan in fact continued to assure him that something would be done.[6] This in turn gives rise to a question as to which period of time Slater's attorney was referencing when he subsequently asked Shepherd whether the acts of harassment he had just described took place "during the period of investigation." Did he mean the period of "like maybe" two weeks beyond which Shepherd believed the company did nothing, or the more open-ended period of time that the company itself attributed to its investigation? The notion that Shepherd's testimony places all of the pertinent acts of harassment prior to or within the "like maybe" two-week period presumes that the question focused on the narrower period when Shepherd thought the company was actually investigating his complaint. But it is not at all clear that Shepherd himself understood the question in that way. Consider the following exchange, just a few pages earlier in the deposition, as to the timing of the incident in which Jemison had stood in front of Shepherd's forklift and dropped his pants:
 
 
 33
 Q. Was this after or before the investigation?
 
 
 34
 A. This was during the investigation.
 
 
 35
 Q. During the investigation?
 
 
 36
 A. Supposedly ... during the investigation.
 
 
 37
 Q. Okay. Okay....
 
 
 38
 Shepherd Dep. 71 (emphasis ours). He used the same language in reference to another incident described later in the deposition. Shepherd Dep. 94. Shepherd's use of the word "supposedly" bespeaks skepticism as to whether the company was, in fact, conducting an investigation when these incidents occurred. It therefore potentially places the incidents beyond the point in time when, although the investigation nominally remained open, the company had (in Shepherd's view) ceased whatever efforts it was taking to address Shepherd's complaint. In so doing, it casts considerable doubt upon the notion that Shepherd would have understood his own testimony to mean that the harassment had concluded once the company had completed two weeks of investigation.
 
 
 39
 Other portions of Shepherd's deposition testimony also suggest that the harassment in fact did not cease two weeks into the company's investigation. Shepherd testified unequivocally that after he complained to Martin and Jordan, Jemison's harassment not only persisted but grew worse. See Shepherd Dep. 69 ("After they talked to Mr. Jemison, that's when everything got real bad."), 70 ("After they had a talk with him, it was pretty much every day."); see also id. at 57. Even if one assumes, therefore, that each of the acts of harassment that Shepherd described individually in his deposition occurred before the point at which he thought the company had effectively finished looking into the matter, Shepherd's testimony that the harassment grew worse and occurred on a daily basis once the company intervened belies the notion that the harassment suddenly ended. We must also point out that Shepherd himself did not consider the list of incidents he described at his deposition to be exhaustive. "There's a lot of things he'd have done to me that I don't recall right now," he explained. Shepherd Dep. 72. Moreover, in addition to the incidents he was able to describe in detail, Shepherd mentioned other acts by Jemison--"playing with" his penis in front of Shepherd, to cite a prominent example--that occurred "maybe four or five times a week" (Shepherd Dep. 63) or "constantly" (Shepherd Dep. 66). Reading Shepherd's deposition as a whole, it is far from clear that these types of behaviors had come to a halt by the time the company had completed two weeks of investigation.[7] In fact, Shepherd testified explicitly that Jemison had used derogatory language "[j]ust about every day" between December 1995 and the date of his termination. Shepherd Dep. 155-56. And when Shepherd was asked about the March altercation that triggered his discharge, he quite clearly rejected the notion that the day of the fight had been a "normal" day in the sense of there having been no "problems" prior to the fight. See Shepherd Dep. 91. "Every day was a problem," Shepherd explained. "He constantly harassed me." Id. When Slater's attorney persisted in questioning whether that day had been "relatively routine" (id. at 92), Shepherd firmly disabused him of the notion that a "routine" day was one free of harassment. "That's what I'm trying to tell you," Shepherd stated. "That is just every day he would always do little nasty things to me." Id.[8]
 
 
 40
 Because Shepherd's testimony leaves ample room for the inference that Jemison's harassment persisted beyond the first two weeks of the company's investigation, the district court abused its discretion in excluding from consideration the portions of Shepherd's affidavit indicating that the harassment, as well as the company's investigation, persisted through the date of Shepherd's termination. In so holding, we do not retreat from our prior admonitions that a party may not avoid summary judgment by attempting to contradict his prior deposition testimony with a later affidavit, absent a plausible explanation for the inconsistency. E.g., Adusumilli, 164 F.3d at 358; Russell, 51 F.3d at 67-68. However, where the deposition testimony is ambiguous or incomplete, as it is here, the witness may legitimately clarify or expand upon that testimony by way of an affidavit. See id. at 68; see also Cowan v. Prudential Ins. Co. of America, 141 F.3d 751, 756-57 (7th Cir.1998).
 
 
 41
 When the whole of Shepherd's affidavit is read in conjunction with his deposition testimony, one may readily infer that the harassment at issue continued unabated long after Shepherd complained to company management. A question of fact therefore remains as to whether Slater was negligent in responding to the harassment, and the judgment in favor of Slater cannot be sustained on that ground. However, Slater insists that it was also entitled to summary judgment on the alternative ground that the harassment of which Shepherd complains was not harassment perpetrated "because of" his sex. We turn to that question next.
 
 B.
 
 42
 Same-sex harassment is actionable under Title VII to the extent it occurs "because of" the plaintiff's sex. 42 U.S.C. § 2000e-2(a); Oncale v. Sundowner Offshore Servs., Inc., supra, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Thus, for Shepherd's claim to be viable, there must be evidence from which the factfinder could infer that Jemison harassed him because he is a man. Our assessment of the record in that respect is guided by the Supreme Court's recent opinion in Oncale.
 
 
 43
 The plaintiff in Oncale was one of eight men working on an oil platform in the Gulf of Mexico. In the course of his employment, he allegedly was "forcibly subjected to sex-related, humiliating actions against him" by his co-workers, was "physically assaulted ... in a sexual manner,"[9] and was threatened with rape. 118 S.Ct. at 1001. He later filed suit against his employer under Title VII, contending that the harassment amounted to sex discrimination. The district court granted summary judgment in favor of the employer, relying on the Fifth Circuit's prior observation that the harassment of a male employee by a male supervisor does not state a claim for sex discrimination under Title VII. See Garcia v. Elf Atochem North America, 28 F.3d 446, 451-52 (5th Cir.1994). The Court of Appeals affirmed, concluding that it was bound by Garcia. Oncale v. Sundowner Offshore Servs., Inc., 83 F.3d 118 (5th Cir.1996).
 
 
 44
 The Supreme Court unanimously reversed. "We see no justification in the statutory language or our precedents for a categorical rule excluding same-sex harassment claims from the coverage of Title VII." 118 S.Ct. at 1002. "[S]exual harassment of any kind" is proscribed by Title VII, the Court explained, so long as it meets the statutory criteria for sex discrimination. Id. (emphasis ours). The harassment must, in other words, amount to " 'discriminat[ion] ... because of ... sex.' " Id., quoting Title VII, 42 U.S.C. § 2000e-2(a)(1) (emphasis in Oncale); see also id. at 1003 (Thomas, J., concurring). Thus, workplace harassment, whatever the gender(s) of the persons involved, does not automatically constitute sex discrimination "merely because the words used have sexual content or connotations." Id. at 1002. Rather, " '[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' " Id., quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 25, 114 S.Ct. 367, 372, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring).
 
 
 45
 The Court identified a number of ways in which the inference of sex discrimination can be drawn in the harassment context. That inference is "easy to draw" if the harasser and the harassed employee are of opposite sexes, at least when the conduct at issue involves, as it often does, "explicit or implicit proposals of sexual activity"; in that setting, "it is reasonable to assume those proposals would not have been made to someone of the same sex." 118 S.Ct. at 1002. The same inference could be drawn where the persons involved are of the same gender, "if there were credible evidence that the harasser was homosexual." Id. "But," the court clarified, "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." Id. The inference is also permissible, for example, when a woman harasses another woman "in such sex-specific and derogatory terms ... as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." Id. Sex discrimination may also be inferred when the plaintiff offers proof that the harasser treated men and women differently in the workplace. Id. "Whatever evidentiary route the plaintiff chooses to follow," the Court summarized, "he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] ... because of ... sex.' " Id. (emphasis in Oncale).
 
 
 46
 Sensitive to the concern that Title VII not be transformed "into a general civility code for the American workplace" (id. at 1002), the Supreme Court took pains to reiterate the importance of the requirement that sexual harassment, whether it involves members of one or both genders, be "so objectively offensive as to alter the 'conditions' of the victim's employment" before it may be deemed sex discrimination (id. at 1003). The objective severity of the harassment must be examined from the viewpoint of "a reasonable person in the plaintiff's position" and must take into account the totality of the circumstances. Id., citing Harris, 510 U.S. at 23, 114 S.Ct. at 371.
 
 
 47
 In same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field--even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.
 
 118 S.Ct. at 1003.[10]
 
 48
 The single question that we need to answer after Oncale is a straightforward one: Can one reasonably infer from the evidence before us that the harassment Shepherd describes was discrimination "because of" his sex? See 118 S.Ct. at 1002. The Supreme Court has now cleared away much of the doctrinal underbrush that previously vexed courts confronting same-sex harassment claims. There is no longer any doubt that Title VII reaches claims of same-sex harassment. Id. It is also settled that same-sex harassment does not amount to sex discrimination only when it is motivated by sexual desire. Id. And it is clear that the sexual content or connotations of workplace harassment do not automatically render that conduct sex discrimination. Id. Again, " '[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' " Id., quoting Harris, 510 U.S. at 25, 114 S.Ct. at 372 (Ginsburg, J., concurring).
 
 
 49
 Oncale also demonstrates that there is no singular means of establishing the discriminatory aspect of sexual harassment. So long as the plaintiff demonstrates in some manner that he would not have been treated in the same way had he been a woman, he has proven sex discrimination. The most direct route to that end, of course, is via proof that men and women were treated differently in the workplace. Id. at 1002. That evidence may be difficult, if not impossible, to obtain when the plaintiff and his harasser work in the kind of single-sex work environment that the Supreme Court confronted in Oncale; and it is in that kind of environment where same-sex harassment frequently occurs. Oncale cited two alternate means by which a plaintiff might show that harassment perpetrated by someone of the same gender constitutes sex discrimination: (1) "credible evidence" that the harasser is gay or lesbian--in which case it is reasonable to assume that the harasser would not harass members of the other sex (or at least not with "explicit or implicit proposals of sexual activity"); and (2) proof that the plaintiff was harassed "in such sex-specific and derogatory terms" as to reveal an antipathy to persons of the plaintiff's gender. Id.
 
 
 50
 Yet we discern nothing in the Supreme Court's decision indicating that the examples it provided were meant to be exhaustive rather than instructive. The Court's focus was on what the plaintiff must ultimately prove rather than the methods of doing so. Indeed, the Court has previously made clear that the means of proving discrimination cannot be reduced to rigid formulae. See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 311-13, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996); Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). What matters, then, is not whether the facts that Shepherd has alleged correspond exactly to any of the examples the Supreme Court has identified, but whether a reasonable factfinder could infer from those facts that Shepherd was harassed "because of" his sex.
 
 
 51
 We must also keep in mind that this case comes to us on appeal from the entry of summary judgment against Shepherd. We therefore owe him the benefit of every reasonable inference that can be drawn from the facts before us. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Reading the record in the light most favorable to Shepherd, we believe that the finder of fact could infer that the harassment was sex-based.
 
 
 52
 There is evidence in the record suggesting that Jemison's harassment of Shepherd was borne of sexual attraction. Recall that the alleged harassment began with Jemison remarking a number of times that Shepherd was a "handsome young man." Shepherd Dep. 63. Subsequently, in one of the more graphic encounters between the two men, Jemison "rubbed himself into an erection" while Shepherd was laying on his stomach with cramps (Shepherd Aff. p 13), and Jemison urged Shepherd to turn over, lest he "crawl up on top of [Shepherd] and fuck [him] in the ass." Shepherd Dep. 66-67; Shepherd Aff. p 13. Jemison remarked to Shepherd another time that "[a] man can come if he's fucked in the ass." Id. Finally, on the occasion that Shepherd came to work complaining of soreness, Jemison offered to make him feel better by giving him "a nice hot shower." Shepherd Dep. 68-69; Shepherd Aff. p 13.
 
 
 53
 Although none of these incidents necessarily proves that Jemison is gay (see Oncale, 118 S.Ct. at 1002), the connotations of sexual interest in Shepherd certainly suggest that Jemison might be sexually oriented toward members of the same sex. That possibility in turn leaves ample room for the inference that Jemison harassed Shepherd because Shepherd is a man. See, e.g., Bacon v. Art Inst. of Chicago, 6 F.Supp.2d 762, 766-67 (N.D.Ill.1998) (Bucklo, J.). Of course, a finder of fact might interpret Jemison's behavior differently. A jury might decide, for example, that Jemison was not at all interested in Shepherd sexually, but made these types of remarks and engaged in this type of behavior simply because he was exceedingly crude and/or because he knew that this type of sexually-charged conduct would make Shepherd uncomfortable. What to make of Jemison's behavior (assuming that it occurred as Shepherd described it) is a task that requires one to weigh the tone and nuances of his words and deeds and a host of other intangibles that the page of a deposition or an affidavit simply do not reveal. This is a task for the factfinder after trial, not for the court on summary judgment.
 
 
 54
 Emphasizing the absence of proof that Jemison treated male and female co-workers differently (see Oncale, 118 S.Ct. at 1002), Slater argues that the sexual content of Jemison's alleged statements and actions is not alone enough to suggest that he harassed Shepherd "because of" Shepherd's sex. We noted in Johnson v. Hondo, Inc., 125 F.3d 408, 412 (7th Cir.1997), that although the explicitly sexual or vulgar nature of the harassment complained of "may often take a factfinder a long way toward concluding that harassing comments were in fact based on gender," the inference is not inevitable. In Johnson, Slater points out, the harasser repeatedly told the plaintiff, "I'm going to make you suck my dick," often while touching himself through his clothing as if masturbating. We did not find that kind of conduct sufficient to raise the inference that the harasser acted "because of" the plaintiff's sex. See id. at 412-13. The sexually-laced allegations here are not so different, Slater reasons, and so the result should be the same. Taken together with other behavior attributed to Jemison that ostensibly was not sexual (pretending to flick "snot" at Shepherd, "mooning" him, and shoving a thumb up his own buttocks), Shepherd's allegations "read like the immature conduct of a crude teenager designed to accomplish a sick juvenile purpose," Slater posits, "not conduct Title VII was intended to address." Slater Br. 24. "This evidence merely demonstrates Jemison's vulgar method of antagonizing Shepherd, but does not raise any inferences that Jemison was engaging in harassing conduct "because of" Shepherd's gender." Id.
 
 
 55
 This is not a case like Johnson, however, in which the sexual references were essentially incidental to what was otherwise run-of-the-mill horseplay and vulgarity. We recognized in Johnson that it is not at all unusual in some settings for people to taunt one another using profanity which, although facially sexual, has little or nothing to do with the gender of the individuals trading insults.
 
 
 56
 Most unfortunately, expressions such as "fuck me," "kiss my ass," and "suck my dick," are commonplace in certain circles, and more often than not, when these expressions are used (particularly when uttered by men speaking to other men), their use has no connection whatsoever with the sexual acts to which they make reference--even when they are accompanied, as they sometimes were here, with a crotch-grabbing gesture. Ordinarily, they are simply expressions of animosity or juvenile provocation....
 
 
 57
 Id. at 412. Whether the sexual content of the harassment is indicative of sex discrimination must therefore be examined with attention to the context in which the harassment occurs. The Supreme Court so stated with respect to the objective severity of the harassment (118 S.Ct. at 1003, quoted supra at 1008), and we believe the Court's observations in that regard are apropos here as well. Where, as in Johnson, "[i]t appears plain on the record as a whole" that the statements or conduct in question "were nothing other than vulgar provocations having no causal relationship to [the plaintiff's] gender as a male," the sexual content or connotations of those statements or conduct will not alone raise a question of fact as to the sex-based character of the harassment. 125 F.3d at 413. On the other hand, when the context of the harassment leaves room for the inference that the sexual overlay was not incidental--that the harasser was genuinely soliciting sex from the plaintiff or was otherwise directing harassment at the plaintiff because of the plaintiff's sex--then the task of deciding whether the harassment amounts to sex discrimination will fall to the finder of fact.
 
 
 58
 The conduct described here goes far beyond the casual obscenity. Jemison did not merely insult Shepherd with a pedestrian epithet akin to "Screw you" (see Johnson, 125 F.3d at 412) or give him a friendly slap on the buttocks (see Oncale, 118 S.Ct. at 1003). Accepting Shepherd's account of events as true, Jemison, after repeatedly remarking that he found Shepherd handsome, embarked on a campaign of harassment which featured, inter alia, Jemison's exposed penis four or five times weekly, repeated instances in which Jemison "grabbed himself" after one fashion or another, and one instance in which Jemison "rubbed himself" into an erection as he threatened to sexually assault Shepherd. The sexual content of this type of behavior is anything but incidental. The finder of fact, evaluating this harassment in context, might reasonably conclude from the relentlessly sexual tenor of the harassment that Shepherd was harassed because he is a man.
 
 
 59
 A more difficult question is whether the inference that Jemison's harassment was sex-based is abrogated by two other items in the record--the first being Shepherd's own admission that Jemison would have harassed him whether he were a man or a woman, and the second being Shepherd's testimony that a female employee, Regina Harris, had told him that Jemison had flashed her as well. Although we readily acknowledge that the factfinder could infer from such evidence that Jemison's harassment was bisexual and therefore beyond the reach of Title VII, see Pasqua v. Metropolitan Life Ins. Co., 101 F.3d 514, 517 (7th Cir.1996), the evidence is not so strong as to make that conclusion inevitable. Shepherd's own testimony hardly amounts to conclusive proof on that point.
 
 
 60
 Q. Now, you said that Mr. Jordan reported to you that Mr. Jemison was at the American Legion grabbing women between the legs; correct?
 
 
 61
 A. Yes.
 
 
 62
 Q. How does that square with your earlier testimony that his sexual preference is males?
 
 
 63
 A. It doesn't. I believe he liked both. I wasn't trying to find--
 
 
 64
 Q. So then it didn't matter whether you were male or female, I guess, working back there, he would have harassed you either way?
 
 
 65
 A. Yeah.
 
 
 66
 Shepherd Dep. 161. Whatever beliefs Shepherd may have as to Jemison's sexual orientation and his propensity to harass women as well as men are to a large extent irrelevant; what matters is whether Jemison in fact did sexually harass members of both genders. Cf. Johnson, 125 F.3d at 413 (plaintiff's speculation that harasser "very possibly" might be gay was "no showing at all"). In that regard, the evidence that Jemison exposed himself to Harris is more pertinent, but it too is hardly definitive. Overlooking the obvious hearsay problem,[11] the evidence establishes nothing more than the possibility that Jemison "played with it" in front of Harris on one occasion. See Shepherd Dep. 113-14. Beyond that, we know nothing at all about the circumstances of that incident. Based on this evidence alone, the notion that Jemison harassed women at the Slater plant in the same way and to the same degree that he allegedly harassed Shepherd is simply unfounded.
 
 
 67
 As the record presently stands, the finder of fact could permissibly conclude that Jemison harassed Shepherd sexually because he is male. Shepherd is therefore entitled to a trial on his claim of sex discrimination.
 
 C.
 
 68
 We believe the court was correct to enter summary judgment in favor of Slater on Shepherd's claim of retaliatory discharge however. Although Shepherd and Jemison have given conflicting accounts of the altercation which triggered Shepherd's discharge, it is undisputed that the two men did in fact come to blows, that as a result of the fight both men required medical treatment, that the company discharged both men after conducting an investigation that yielded no evidence proving one account or the other to be the correct one, and that the company offered each man a "last chance" agreement permitting him to return to work. Shepherd questions the company's motives in discharging him, but whatever those motives might have been, there is in this record no evidence that the company acted in anything but good faith or that it discharged him for any reason other than the fact that he had physically fought with another employee on company premises. Shepherd does have evidence that the company treated other employees who were involved in altercations less harshly: Regina Harris was given a five-day suspension (later reduced to three days) after she engaged in an argument with another employee (see "Second" Harris Aff. pp 2-6), and Rick Thompson was not disciplined at all after he threw a drink in another employee's face (see Nevil Aff. p 9). But, as the district court noted, "neither altercation compares with Shepherd's altercation: a fight in which clubs were use[d] to injure, and both employees received medical treatment." Order at 17. We therefore agree that the evidence does not suffice to demonstrate that Slater's stated reason for discharging Shepherd was pretextual.[12]
 
 III.
 
 69
 For the reasons discussed, we AFFIRM the judgment in part and REVERSE it in part. The case is REMANDED to the district court for a trial on Shepherd's claim of sex discrimination. The parties shall bear their own costs of appeal.
 
 
 70
 BAUER, Circuit Judge, dissenting.
 
 
 71
 I respectfully dissent. While not being willing to tackle the lengthy and very fact-specific opinion on a page-by-page or encounter-by-encounter basis, I believe the district court was absolutely correct; the undisputed facts show that the hostile work environment was not a gender-based hostility. The obnoxious, crude and outrageous behavior the plaintiff complains of was directed at male and female alike; it was offensive to male and female alike. It is even offensive in the repeating. Nevertheless, Shepherd has failed to meet the requirement of a prima facie sexual harassment case based on a hostile work environment.
 
 
 72
 I join that position of the opinion which affirms the district court's dismissal of the retaliatory firing claim. As to the rest, I would adopt the quite persuasive opinion of the trial judge.
 
 
 
 [1]
 Shepherd traces the harassment back to offers Jemison had previously made on numerous occasions to loan him money. (Jemison had told Shepherd that he was worth more than $200,000.) Shepherd had never taken Jemison up on his offers. It was after Shepherd had repeatedly rebuffed the loan offers that Jemison began to express an apparent sexual interest in Shepherd. Shepherd subsequently concluded that the money Jemison had offered him "was in exchange for sex." Shepherd Aff. p 14
 
 
 [2]
 Apparently as proof that Jemison really did expose himself to Shepherd, Shepherd notes that he was able to see that Jemison's penis was discolored and blotchy. See Shepherd Br. 4; Shepherd Dep. 74
 
 
 [3]
 Shepherd had also asserted a claim against his union, the United Steelworkers of America, Local No. 14, for breach of the union's duty of fair representation. The court went on to grant summary judgment in favor of the union on that claim. Order at 18-22. Shepherd has not appealed this aspect of the district court's ruling, so we need not discuss it
 
 
 [4]
 To say that Shepherd "knew" the investigation lasted no longer (Order at 14) overstates his testimony. Foremost, it assumes a fact not in evidence, for nothing in the record conclusively establishes that the company actually closed the investigation after two weeks. Compare Shepherd Aff. pp 6, 10, 11 and Shepherd Dep. 74, 154-55, 158, with Jordan Dep. 11-13. Shepherd himself had no apparent first-hand knowledge on this subject. Indeed, his testimony on its face signals that he was offering no more than his own opinion as to the length of the company's efforts. He stated that he "believed" the investigation concluded after two weeks (Shepherd Dep. 74), and as we point out below, Shepherd immediately qualified that opinion by referencing Jordan's assurances that the investigation remained active (id.)
 
 
 [5]
 [Footnote by this Court] The reference to "shutdown" is, as we have indicated, to the annual closing of company facilities in late December for the holiday season. There is no dispute that at least some of the alleged harassment occurred after the shutdown. See, e.g., Shepherd Dep. 68-71. Nor is there any dispute that the company's investigation (whether it lasted two weeks or for a longer period of time) took place in whole or in part after the holiday shutdown. See, e.g., Jordan Dep. 8. Therefore, when Slater's attorney asked Shepherd whether the incidents of harassment he described had occurred "before shutdown and during the period of investigation," he necessarily must have meant to inquire whether they occurred either before the shutdown or during the investigation
 
 
 [6]
 Jordan himself testified that he stopped interviewing witnesses in regard to Shepherd's complaint in mid-January 1996, when Shepherd purportedly came to him and told him that he and Jemison were attempting to work out their differences. Jordan Dep. 11-12. Jordan acknowledged, however, that Shepherd did not "sign off" on closing the investigation. Id. at 12. In fact, Jordan testified that "I told [Shepherd], you know, I would not close this. This is a continuing thing until I hear back from him." Id. Jordan went on to say that he never did hear back from Shepherd, at least in any way that resolved the status of his complaint. Id. Jordan would periodically run into either Shepherd or his department manager, Martin, and when he did so would inquire how things were going. Both consistently said that all was well, according to Jordan (id. at 12-13), and Shepherd never complained again that Jordan could recall (id. at 12)
 For his part, Shepherd specifically denies having ever told Jordan that he and Jemison were attempting to resolve their conflicts and that he did not wish to pursue his complaint. Shepherd Aff. p 11. On the contrary, Shepherd alleges, as we have previously noted, that he continued to complain to both Jordan and Martin through the date of his discharge in March 1996. Id. pp 6, 10, 11.
 Of course, given that this case was terminated at the summary judgment stage, we are obligated to credit Shepherd's allegations as to what he told his employer and what Jordan and Martin told him about the status of the investigation.
 
 
 [7]
 When Shepherd was asked about the timing of the harassment, it is not clear whether the questioner and Shepherd were focused on the individual acts of harassment Shepherd had described up until that point, or instead upon the entire body of harassment that Shepherd was alleging. Just before that question was posed, Shepherd had described some five individual incidents of harassment (Shepherd Dep. 64-71) apart from the types of harassment that Jemison purportedly engaged in "maybe four or five times a week" (Shepherd Dep. 63), "constantly" (Shepherd Dep. 66) or "always" (Shepherd Dep. 67)
 
 
 [8]
 The district court construed Shepherd's testimony to mean that nothing noteworthy had happened on the day of the fight. It therefore disregarded the allegation in Shepherd's affidavit that Jemison had "grabbed himself" earlier that day (Shepherd Aff. p 17), believing that allegation to be inconsistent with Shepherd's deposition testimony. Order at 16 n. 6. As is plain from the discussion above, however, that interpretation of Shepherd's testimony was erroneous, and consequently the decision to disregard this allegation in the affidavit was likewise mistaken
 
 
 [9]
 The Court of Appeals' opinion in Oncale reveals that a co-worker once placed his penis on the plaintiff's neck and on another occasion placed it on the plaintiff's arm, in both instances while other workers restrained the plaintiff. On another occasion, the plaintiff was held down in a shower while a co-worker pushed a bar of soap into the plaintiff's anus. 83 F.3d 118, 118-19 (5th Cir.1996)
 
 
 [10]
 The objective severity of the harassment is not an issue that has been raised in this appeal
 
 
 [11]
 Shepherd testified that Jemison had "played with it" in front of Harris, and when asked how he knew that, Shepherd explained that Harris had approached him after learning of Shepherd's allegations and told him that Jemison had "done [her] the same way." Shepherd Dep. 113-14. Harris submitted two affidavits to the court regarding the allegations in this case, but neither one confirms that Jemison had exposed himself to her
 
 
 [12]
 Although Shepherd agrees that fighting is normally a legitimate ground for termination, he suggests that it is not so here because the fight was the result of "Slater's lackluster investigation and failure to act appropriately." Shepherd Br. 27 (footnote omitted). The question before us, however, is not whether engaging in an altercation is or is not an appropriate ground for discharge. Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410-11 (7th Cir.1997). The only issue that concerns us is whether the stated ground is the real reason that Slater discharged Shepherd. If, as Shepherd contends, the fight was the inevitable result of Jemison's unchecked harassment, then that would certainly reflect on the adequacy of the steps Slater took to investigate and respond to Shepherd's complaints. But absent some proof that Slater itself did not genuinely believe that the fight warranted discharge--that it had not fired other employees who fought so ferociously, for example--we cannot say that the reason for Shepherd's discharge was pretextual simply because the company may have been unfair